EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Departamento de Asuntos del Consumidor<br><br>Peticionario<br><br>v.<br><br>Luma Energy, LLC; LUMA Energy ServCo, LLC; Negociado de Energía de Puerto Rico; Autoridad de Energía Eléctrica<br><br>Recurridos | 2025 TSPR 126<br><br>216 DPR ___ |

Número del Caso: CT-2025-0003

Fecha: 1 de diciembre de 2025

Representante legal de la parte peticionaria:

Lcda. Valerie Rodríguez Erazo

Representantes legales de la parte recurrida:

**Luma Energy, LLC; Luma Energy ServCo, LLC**

Lcdo. Frank Torres Viada
Lcdo. José Andreu Fuentes
Lcda. Margarita Mercado Echegaray
Lcda. Yahaira De la Rosa Algarín
Lcdo. Jan M. Albino López

**Autoridad de Energía Eléctrica**

Lcdo. Juan M. Martínez Nevarez
Lcda. Mirelis Valle Cancel

Representantes legales de los *Amici Curiae*:

**Senado de Puerto Rico**
**Cámara de Representantes de Puerto Rico**

Lcdo. Charles A. Rodríguez Colón
Lcdo. Miguel A. Rodríguez Ramos

**Instituto de Competitividad y Sostenibilidad Económica**

Lcdo. Fernando E. Agrait
Lcdo. José Leonardo Pou Román

**Negociado de Energía de la Junta Reglamentadora de Servicio Público**

Lcdo. Edgardo L. Rodríguez Cardé
Lcda. Yarymar González Carrasquillo

**Oficina Independiente de Protección al Consumidor de la Junta Reglamentadora del Servicio Público**

Lcda. Hannia B. Rivera Díaz
Lcdo. Pedro E. Vázquez Meléndez

Materia: Derecho Constitucional – Legitimación activa del Departamento de Asuntos del Consumidor para presentar una acción a favor de los consumidores; Inconstitucionalidad de la inmunidad o exoneración de responsabilidad concedida por un ente administrativo al violar la separación de poderes.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Departamento de Asuntos del Consumidor<br><br>Peticionario<br><br><br>v.<br><br><br>LUMA Energy, LLC; LUMA Energy ServCo, LLC; Negociado de Energía de Puerto Rico; Autoridad de Energía Eléctrica<br><br>Recurridos | CT-2025-0003 |

**El Juez Asociado señor Candelario López emitió la Opinión del Tribunal.**

En San Juan Puerto Rico, a 1 de diciembre de 2025.

"*Para que no se pueda abusar del poder, es preciso que el poder detenga al poder*". - Montesquieu

En esta ocasión tenemos la oportunidad de reafirmar que las agencias administrativas solamente tienen los deberes y las facultades que le son delegadas por la Asamblea Legislativa. En específico, nos corresponde pasar juicio sobre si el Negociado de Energía de Puerto Rico (NEPR o Negociado) se extralimitó al otorgar un relevo de responsabilidad por negligencia ordinaria a una entidad privada por daños relacionados con la operación del sistema eléctrico. Así, debemos resolver si el relevo de responsabilidad antes descrito constituye una inmunidad frente a reclamaciones extracontractuales de terceros. De

contestar en la afirmativa, nos corresponde justipreciar si el Negociado, siendo un foro administrativo, tiene la facultad legal para aprobar, mediante resolución, una cláusula de exoneración de responsabilidad a un ente privado.

Por considerar que el relevo de responsabilidad en cuestión es, en efecto, una inmunidad frente a reclamaciones extracontractuales causadas por negligencia ordinaria, y, por entender que la Asamblea Legislativa no le delegó al NEPR la facultad para otorgar dicha inmunidad, concluimos que la actuación del Negociado es *ultra vires* por contravenir la doctrina de separación de poderes. Recordemos que la delegación legislativa no representa una renuncia del poder legislativo, sino que es la expresión de su capacidad para estructurar, distribuir y operacionalizar la gestión pública de manera eficiente.

I

El presente recurso tiene su origen en una controversia sobre la interpretación contractual de una cláusula de exoneración de responsabilidad. El 22 de julio de 2025, el Departamento de Asuntos del Consumidor (DACo) presentó ante el Tribunal de Primera Instancia (TPI) una *Solicitud de sentencia declaratoria para declarar inconstitucional la sección 4.1(g) del Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (OMA), en contra de LUMA Energy, LLC,

LUMA Energy ServCo, LLC, (en conjunto, LUMA), el Negociado y la Autoridad de Energía Eléctrica (AEE). En síntesis, solicitó que se declarara nula e inconstitucional la Sección 4.1(g) del OMA y el *Resolution and Order* emitido por el Negociado el 31 de mayo de 2021 (Resolución del NEPR), por entender que, mediante esta, el NEPR le otorgó a LUMA y a la AEE una inmunidad casi absoluta frente a reclamaciones de consumidores, que no estaba facultado en ley a conceder. En consecuencia, solicita que se permita que todo ciudadano pueda llevar reclamaciones en daños causados por la negligencia y la fluctuación del servicio de energía eléctrica ante LUMA.

Según expuso el DACo, el 24 de febrero de 2021, LUMA presentó ante el NEPR un *Request for Approval of Terms of Service and Memorandum of Law in Support*, en el cual, entre otras cosas, solicitó que se apruebe la sección 4.1(g) del OMA. Alegó que esta sección concede un relevo total para LUMA y sus empleados, oficiales y contratistas contra reclamos de consumidores por daños causados por negligencia o fluctuaciones en el servicio eléctrico. Sostuvo que, previo a la firma del OMA, la corporación pública no gozaba de tal inmunidad y contaba con un mecanismo para que los consumidores presentaran sus reclamos.

Surge del OMA que la citada Sección 4.1(g) establece lo siguiente:

(g) **Liability Waiver.** In connection with the submission of the Initial Budgets to PREB, the

Parties agree to apply for inclusion in the Rate Order that the associated tariff or terms of service include: (i) **a waiver** of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the T&D System and the provision of Power and Electricity including any events of interrupted, irregular or defective electric service due to Force Majeure Events, other causes beyond Owner's, ManagementCo's or ServCo's control or **ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors;** and (ii) **a waiver** in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where **caused by any of Owner's, ManagementCo's or ServCo's ordinary negligence, gross negligence or willful misconduct** (collectively the "Liability Waiver").

(Énfasis suplido).

Añadió el DACo que, el 25 de mayo de 2021, el Negociado celebró una vista pública con el propósito de escuchar al público general en cuanto a los términos de servicio propuesto. Así las cosas, el 31 de mayo de 2021, el Negociado emitió su resolución en la cual determinó, entre otros asuntos, lo siguiente:

5. Notwithstanding anything to the contrary in these Modified Terms of Service and Regulation 7982, PREPA, its directors, officers, employees, agents and contractors (including LUMA Energy, LLC, LUMA Energy Servco, LLC, their directors, officers, employees, agents and contractors) (the "Released Parties") **shall not be liable contractually or extra-contractually, to customers, or any user receiving power or**

**electricity from PREPA and/or LUMA for any losses arising in any way out of or in connection with the operation of the T&D System and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to Force Majeure events or from preexisting deteriorated electric system conditions, other causes beyond the control of the Released Parties, unauthorized acts by employees, sabotage, strikes or due to ordinary negligence (excluding gross negligence, willful misconduct or dolo)** of the Released Parties or their respective employees, agents or contractors. In any event that the Released Parties are found responsible howsoever and whensoever in connection with the provision of service to customers or users receiving power or electricity from PREPA and/or LUMA, customers or users shall only recover direct damages (including direct physical loss, injury or damage to a customer or customer's property). For the foregoing and without otherwise restricting the generality thereof, "direct physical loss, injury or damage" shall not include any loss of profits or revenues, special, exemplary, punitive, indirect, incidental, or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms.

(Énfasis suplido).

De acuerdo con el DACo, la Resolución del NEPR modificó el contenido que se pretendía adoptar de la Sección 4.1(g) del OMA para dejar fuera casos de negligencia crasa de LUMA. A su juicio, otorgó un abarcador relevo de responsabilidad mediante un proceso "administrativo y contractual", violando el principio de reserva de la ley, pues no fue producto de un proceso legislativo. Además, el DACo adujo que el Estado no puede conferir, por *fiat* administrativo y contractual, una inmunidad cuasi soberana a una empresa privada sin que ello

sea evaluado por la Legislatura. De este modo, concluyó que el NEPR intenta limitar o suprimir las reclamaciones extracontractuales en perjuicio de terceros sin participación ni aval de la Asamblea Legislativa, constituyendo una usurpación del poder legislativo y un atentado contra la doctrina de separación de poderes.

Así las cosas, el 24 de julio de 2025, el Senado de Puerto Rico y la Cámara de Representantes de Puerto Rico presentaron una *Solicitud y alegato del Senado de Puerto Rico y la Cámara de Representantes de Puerto Rico en calidad de amigos de la corte.* En resumen, adoptaron el planteamiento del DACo de que el NEPR aprobó por vía administrativa una cláusula de inmunidad casi absoluta a favor de LUMA sin la intervención de la Asamblea Legislativa y en perjuicio de terceros no contratantes, entiéndase, los consumidores. De esta forma, alegaron que la inmunidad dispuesta en la Sección 4.1(g) del OMA y la Resolución del NEPR constituyen una violación a la separación de poderes consagrada en la Constitución de Puerto Rico. Además, ambos cuerpos legislativos sostuvieron que, al aprobar la Ley de la Autoridad de Energía Eléctrica de Puerto Rico, *infra*, y la Ley para Transformar el Sistema Eléctrico de Puerto Rico, *infra*, no delegaron a la AEE ni a la Autoridad para las Alianzas Público-Privadas (AAPP) la facultad de otorgar inmunidad a favor de la AEE y LUMA. Por consiguiente, solicitaron que se declare *ha lugar* la petición de sentencia declaratoria

presentada por el DACo y se declaren nulas la Sección 4.1(g) del OMA y la Resolución del NEPR.

Por su parte, el 6 de agosto de 2025, el Instituto de Competitividad y Sostenibilidad Económica (ICSE) presentó una *Solicitud de intervención como amicus curiae*, en apoyo a que se conceda el remedio solicitado por DACo. En primer término, indicó que, en el año 2021, litigó el mismo asunto ante el NEPR y ante el Tribunal de Apelaciones, aunque en esa ocasión no se le reconoció legitimación activa para ello.[1] El ICSE reconoció la naturaleza constitucional del planteamiento del DACo sobre división de poderes. No obstante, señaló que la controversia puede atenderse como un asunto de estricto derecho de daños y perjuicios, pues, contrario a lo dispuesto en la Resolución del NEPR, nuestro ordenamiento jurídico no permite limitar las categorías ni las cuantías de daños que puede recuperar una persona como reparación por el daño sufrido. Según el ICSE, en Puerto Rico la responsabilidad por daños contractuales o extracontractuales es materia estrictamente sustantiva, determinada por legislación, por lo que solo la Asamblea Legislativa puede crear exenciones o inmunidades. En ese sentido, arguyó que el NEPR legisló una inmunidad que solo puede ser concedida por la vía legislativa y, además, que

---

[1] Véase *In re: Revisión de los términos de servicio de LUMA (extensión de responsabilidad)*, caso núm. KLRA202100406, en el cual el Tribunal de Apelaciones desestimó el recurso incoado por el ICSE, por carecer de legitimación activa.

estamos ante un asunto contractual, no tarifario, como pretenden hacer ver el Negociado y LUMA.

Así las cosas, el 8 de agosto de 2025, el DACo presentó ante nos un *Recurso de certificación intrajurisdiccional*. A grandes rasgos, reiteró los fundamentos que levantó ante el foro primario, y adujo que, durante una vista pública celebrada por la Cámara de Representantes, LUMA admitió no haber atendido 1,828 querellas de consumidores sobre daños a la propiedad, pérdida de enseres y otras consecuencias atribuibles a fallas eléctricas, por entender que la Resolución del NEPR la exime de hacerlo. Según el DACo, este reconocimiento público promueve que los consumidores se queden sin remedios ante fallas operacionales de la entidad que gestiona este servicio esencial. Ante ello sostuvo que la controversia está madura para adjudicación, y que amerita nuestra intervención urgente para detener este estado de indefensión, restaurar el balance constitucional y reafirmar que en Puerto Rico nadie puede operar al margen de la responsabilidad legal.

El 12 de agosto de 2025 emitimos una *Resolución* en la que concedimos un término de tres (3) días para que las partes recurridas se expresaran sobre el recurso de epígrafe. Al día siguiente, el ICSE presentó una *Moción en cumplimiento de resolución* en la cual, en apoyo a que se expidiera el recurso, solicitó que consideráramos sus argumentos como *amicus curiae* ante el foro primario, los cuales reiteró en su escrito.

El 15 de agosto de 2025, el Senado y la Cámara de Representantes comparecieron de manera conjunta, y adoptaron la posición del DACo en cuanto al carácter constitucional de esta controversia. En específico, destacaron que la doctrina de separación de poderes les concede facultad exclusiva para examinar, establecer y otorgar inmunidad ante reclamaciones por daños.

En esa misma fecha, el NEPR presentó su *Moción en cumplimiento de orden*, oponiéndose a la expedición del recurso. De entrada, argumentó que esta no es una controversia constitucional sustantiva ni sobre separación de poderes. Por el contrario, sostuvo que versa sobre un relevo de responsabilidad otorgado como parte de un proceso tarifario efectuado dentro de las facultades delegadas al NEPR, para evaluar modificaciones a los términos de servicio relacionados a la responsabilidad de LUMA y la AEE por pérdidas de clientes y usuarios del sistema eléctrico como consecuencia de su operación.

El Negociado expuso que, un "liability waiver" en el ámbito de compañías que proveen servicios esenciales al público, tiene como finalidad evitar que el costo de indemnizar reclamaciones incremente sustancialmente el costo del servicio, el cual en la mayoría de los casos sería finalmente sufragado por los propios clientes y usuarios. Arguyó que el relevo procura mantener tarifas más bajas y estables, preservando la viabilidad financiera de la operación y la continuidad del servicio eléctrico.

Aunque rechazó los términos propuestos por las partes, sostuvo que aprobó ciertas modificaciones que entendió salvaguardaban el interés público, y que las adoptó, luego de celebrar vistas públicas en las cuales participó la Oficina Independiente de Protección al Consumidor (OIPC).

Además, según el NEPR, en este caso no está presente el criterio de urgencia que requiere la expedición de un recurso de certificación intrajurisdiccional, pues el relevo fue adoptado cuatro (4) años antes de la presentación de esta solicitud de sentencia declaratoria. Indicó que esta etapa de los procedimientos tampoco era propicia, pues las partes aún no habían comparecido ante el foro de instancia ni realizado descubrimiento de prueba. De manera escueta, insistió en que no estamos ante una controversia constitucional sustancial, y reiteró que, en su estimación, los usuarios terminarán pagando las indemnizaciones que se concedan. Finalmente, cuestionó una vez más la legitimación del DACo para instar esta acción.

También en esa fecha, LUMA presentó su *Oposición a recurso de certificación intrajurisdiccional*. LUMA siguió el ejemplo del NEPR y cuestionó la urgencia de expedir una certificación. Levantó, además, "asuntos de índole jurisdiccional" que debe atender el foro de instancia antes de atender en los méritos la validez del relevo de responsabilidad impugnado, a saber: (1) la legitimación activa del DACo, la cual, a su juicio, ostenta la OIPC; (2) la ausencia de un daño claro, real y palpable del DACo que

le permita cuestionar si la determinación del NEPR viola la separación de poderes o si privó a la Asamblea Legislativa de sus prerrogativas; y (3) la falta de parte indispensable, ante la ausencia de la AAPP en el pleito. Arguyó que la limitación de responsabilidad de compañías de servicio eléctrico responde a una delegación de poderes de la Legislatura al NEPR, aunque no citó la disposición específica que confiere tal facultad. Repitió, sin más, el argumento de que la limitación de responsabilidad es parte inherente al proceso de fijación de tarifas, con el propósito de asegurar tarifas razonables. En cuanto al relevo de responsabilidad como mecanismo regulatorio, LUMA indicó que se trata de la norma en los Estados Unidos y otras jurisdicciones, pues lo contrario "socavaría el poder válidamente delegado en el NEPR de cumplir sus deberes y funciones sobre la fijación de tarifas del servicio eléctrico".

Finalmente, compareció la AEE a través de una breve *Moción en cumplimiento de orden de mostrar causa* para pronunciarse a favor de que acojamos y expidamos el recurso ante nuestra consideración, pues "los abonados de la A.E.E. merecen tener certeza sobre sus derechos".

Evaluadas las posiciones de las partes, el 22 de agosto de 2025, emitimos una *Resolución* en la cual expedimos el recurso de certificación intrajurisdiccional. Así, concedimos un término de quince (15) días al DACo para

presentar su alegato, y quince (15) días a partir de entonces a los recurridos para presentar su posición.

El 8 de septiembre de 2025, el DACo presentó su alegato. Desde su punto de vista, la controversia ante nuestra consideración requiere responder la siguiente pregunta: ¿puede una agencia administrativa conferir a un operador privado una inmunidad general frente a reclamaciones extracontractuales de terceros, incluida la negligencia ordinaria, sin autorización legislativa expresa? Por entender que no, solicitó que emitamos una sentencia declarando que no es posible tal atribución por tratarse de un acto que rebasa la competencia del NEPR y altera el régimen sustantivo de responsabilidad civil sin que se lo permita su ley habilitadora.

Según el DACo, su ley orgánica le confiere legitimación estatutaria para instar esta acción, pues la Asamblea Legislativa le encomendó expresamente "vindicar y hacer efectivos los derechos de los consumidores en todos los foros necesarios", en cualquier asunto "que afecte o pueda afectar" sus intereses. Arguyó que muchos consumidores han sufrido daños por actos negligentes de LUMA y otros podrían razonablemente verse afectados de no intervenir el DACo. En cuanto a la competencia de la OIPC, sostuvo que se limita a asuntos relacionados a tarifas, facturación, calidad de servicio y otros aspectos técnicos de los servicios regulados, no a derechos sustantivos de los consumidores en materia de daños. Adujo de manera

sucinta que no existen partes indispensables ausentes de este pleito, pues, aunque la AAPP firmó el OMA, no asumió obligaciones o deberes atinentes a esta controversia.

En lo sustantivo, el DACo reiteró que la limitación de responsabilidad a favor de un operador privado no constituye un componente básico y legítimo de la tarifa eléctrica, sino una concesión *ultra vires* del NEPR. En cuanto a esto, señaló que la Ley Núm. 57-2014, *infra*, no delegó al Negociado la facultad de eximir a un operador privado de responsabilidad civil frente a reclamos de consumidores por actos de negligencia. Destacó además que está constitucionalmente establecido que toda franquicia o concesión de carácter público debe ser determinada por ley, por lo que compete a la Asamblea Legislativa conceder relevos de responsabilidad como el otorgado por el NEPR. En consecuencia, concluyó que el Negociado se extralimitó al otorgar una inmunidad a LUMA sin autoridad en ley, por lo cual la actuación impugnada es nula *ab initio*.

El mismo día, el ICSE presentó un *Alegato del Amicus Curiae*. Adujo que coincidía con el DACo y la Asamblea Legislativa en que la exención otorgada a LUMA es ilegal porque la determinación administrativa del NEPR se inmiscuye indebidamente en el Poder Legislativo, beneficiando no solo a LUMA, sino a la propia AEE. A manera de ejemplo, identificó varias instancias en que el legislador concedió exenciones de responsabilidad por daños y perjuicios, entre ellas, a patronos bajo el Fondo del

Seguro del Estado y en casos de impericia en centros de educación médica. Asimismo, cuestionó la prudencia de facultar a un regulador para que exima de responsabilidad a entidades bajo su jurisdicción.

El 23 de septiembre de 2025, LUMA presentó su alegato.[2] En su escrito, como hizo al oponerse a la expedición del recurso, planteó los impedimentos jurisdiccionales que, a su juicio, deben guiar nuestro análisis, a saber: falta de legitimación activa del DACo, falta de parte indispensable y, en cuanto a la inconstitucionalidad de trasladar a las facturas de sus clientes los pagos de indemnización que tenga que realizar, que DACo solicita una opinión consultiva. En términos sustantivos, LUMA enfatizó las bases que han justificado la concesión de limitaciones de responsabilidad para compañías de servicio público en diversas jurisdicciones estadounidenses. Adujo que los tribunales de estas jurisdicciones han validado que la regulación de tarifas se extiende a la adopción de límites de responsabilidad por negligencia, sin requerir que la ley habilitadora del ente regulador lo faculte expresamente. Partiendo de la premisa de que la limitación de responsabilidad es parte inherente de la función

---

[2] Previo a la presentación de su alegato, el 19 de septiembre de 2025, LUMA notificó a esta Curia, mediante una *Moción informativa*, que presentó un *Urgent Motion of LUMA to Enforce the Automatic Stay* en el caso Núm. 17-BK-4780-LTS, actualmente ventilándose ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico bajo el Título III de la Ley PROMESA.

En lo pertinente, el 30 de octubre de 2025, el DACo presentó una *Moción informativa* en la cual anejó el *Memorandum Order Denying Urgent Motion of LUMA to Enforce the Automatic Stay*, del 27 de octubre de 2025, declarando *no ha lugar* la petición de LUMA.

regulatoria delegada, sostuvo que el NEPR estaba facultado a emitir su resolución.

En esa misma fecha comparecieron el Senado y la Cámara de Representantes para unirse al alegato del DACo, dejando clara su posición de que el NEPR se excedió en sus facultades al conceder una inmunidad, que solo la Asamblea Legislativa puede conceder. En particular, citaron la Sección 13 del Art. VI de la Constitución de Puerto Rico, que, en lo pertinente, prescribe que "[e]l procedimiento para otorgar franquicias, derechos, privilegios y concesiones de carácter público será determinado por ley". Dado lo anterior, solicitaron que se decrete la nulidad de la Resolución del NEPR.

Dentro del término concedido, compareció la AEE y la OIPC, esta última, mediante *Solicitud de intervención y alegato de la interventora Oficina Independiente de Protección al Consumidor de la Junta Reglamentadora de Servicio Público*. Rechazó la postura del DACo de que no está facultada para atender controversias de naturaleza constitucional, pues la Ley Núm. 57-2014, *infra*, la faculta para comparecer como parte peticionaria o como interventora en cualquier acción relacionada con tarifas, facturas, política pública o cualquier otro asunto que pueda afectar a los clientes del servicio eléctrico. En los méritos, la OIPC coincide en que la Sección 4.1(g) del OMA es ilegal por tratarse de un "autorelevo" de responsabilidad por la AEE y LUMA en ausencia de intención manifiesta de los

consumidores de relevarlos. De igual modo, indicó que el OMA es un contrato de adhesión en el que los clientes no participaron y, por lo tanto, debe interpretarse restrictivamente contra la agencia.

Finalmente, el 24 de septiembre de 2025, el Negociado presentó su alegato. En lo pertinente, reiteró la necesidad y deseabilidad de que un operador privado cuente con límites de responsabilidad por negligencia, así como la fuente de derecho que entiende apoya su actuación al otorgar el relevo, esto es: que esa es la práctica en diversos estados de Estados Unidos. Además, levantó los mismos argumentos jurisdiccionales indicados por LUMA.

Evaluados detenidamente los alegatos de las partes, así como los escritos presentados por las partes interventoras y amigos de la corte, procedemos a resolver.

## II

Teniendo ante nuestra consideración una controversia relacionada a un asunto de alto interés público, a saber, sobre el sistema de energía eléctrica de Puerto Rico, conviene que hagamos un recuento histórico de los hechos que la anteceden.

La historia del Gobierno de Puerto Rico como encargado de producir y administrar la energía eléctrica del país tiene su origen en la tercera década del siglo XX. Ante la necesidad de producir energía eléctrica a un bajo costo

debido al proceso de industrialización que se avecinaba, el *Puerto Rico Reconstruction Administration* (PRRA) tenía como objetivo la electrificación rural del país. Así, la PRRA, agencia creada por el Congreso de los Estados Unidos para liderar la recuperación puertorriqueña tras los eventos atmosféricos de 1928 y 1932,[3] determinó que las plantas hidroeléctricas a ser construidas fueran entregadas eventualmente al Gobierno de Puerto Rico para ser incorporadas en el creciente sistema de energía eléctrica.[4]

Posteriormente, con la aprobación de la Ley Núm. 83 de 2 de mayo de 1941, actualmente conocida como la *Ley de la Autoridad de Energía Eléctrica de Puerto Rico*, se creó la Autoridad de Fuentes Fluviales (AFF). Entre los propósitos del referido estatuto, la Asamblea Legislativa buscaba centralizar el servicio eléctrico de Puerto Rico. Fue bajo el desarrollo de la AFF, y posteriormente, la AEE,[5] que la electricidad adquirió acceso a la totalidad de la población puertorriqueña. No obstante, la tasa de crecimiento anual proyectada en el consumo eléctrico era tal, que ameritaba la necesidad de incrementar en la capacidad de generación.

---

[3] Véase, Executive Order 7057, *Establishing the Puerto Rico Reconstruction Administration* (May 28, 1935).

[4] E. Látimer Torres, *Historia de la Autoridad de Energía Eléctrica: Implantación de los Sistemas de Luz y Fuerza en Puerto Rico 1893-1993*, 1ra ed., San Juan, First Book Pub. of P.R., 1997, pág. 342.

[5] Mediante la Ley Núm. 57 de 30 de marzo de 1979, la Asamblea Legislativa le cambió el nombre a la Autoridad de Fuentes Fluviales a la Autoridad de Energía Eléctrica.

A medida que aumentaba el consumo de energía eléctrica, la empresa privada fue incorporada en dichas operaciones. A modo de ejemplo, para la década de 1990, fueron instaladas la EcoEléctrica en Guayanilla y AES en Guayama, cada una produciendo alrededor de 15% de la electricidad que consumía el país.

En lo aquí pertinente, se aprobó la *Ley de Transformación y ALIVIO Energético*, Ley Núm. 57-2014, según enmendada, 22 LPRA sec. 1051 *et seq*., cuya Exposición de Motivos esboza lo siguiente:

> Luego de más de setenta (70) años de creada, y más de tres décadas luego de cumplir con su mandato de electrificación total del País, la AEE se ha convertido en un monopolio que se regula a sí misma, decide sus tarifas sin fiscalización real, incurre en ineficiencias operacionales, gerenciales y administrativas, cuyo costo al final del día es asumido directamente por el consumidor, y mantiene una gobernanza interna que carece de transparencia y participación ciudadana. Todo ello contribuye a que Puerto Rico esté en una de las primeras posiciones con respecto a los costos energéticos más altos entre las jurisdicciones de los Estados Unidos.

## A. Negociado de Energía de Puerto Rico

Por virtud de la *Ley de Transformación y ALIVIO Energético*, *supra*, se creó la Comisión de Energía de Puerto Rico, ahora el Negociado de Energía de Puerto Rico (NEPR). 22 LPRA sec. 1054b. El NEPR fue concebido como una entidad especializada e independiente, encargada de reglamentar, supervisar y hacer cumplir la política pública energética del Gobierno de Puerto Rico. 22 LPRA sec. 1051a(j). En aras de promover la transparencia y autonomía en sus

menesteres, el NEPR fue separado de cualquiera de las entidades bajo su jurisdicción. 22 LPRA sec. 1054k.

Esto constituyó un paso significativo en la fragmentación de las facultades que, en su momento, eran exclusivas de la AEE, y delegó al NEPR ciertos poderes de fiscalización como regulador independiente. Entre las facultades otorgadas al NEPR por la Asamblea Legislativa, se encuentran las siguientes:

(a) Fiscalizar y asegurar la cabal ejecución e implementación de la política pública sobre el servicio eléctrico en Puerto Rico;

(b) Establecer mediante reglamento las normas de política pública en relación con las compañías de servicio eléctrico, así como toda transacción, acción u omisión que incida sobre la red eléctrica y la infraestructura eléctrica en Puerto Rico, e implementar dichas normas de política pública. Estos reglamentos deberán ser cónsonos con la política pública energética declarada por vía de legislación;

(c) Establecer e implementar los reglamentos y las acciones regulatorias necesarias para garantizar la capacidad, confiabilidad, seguridad, eficiencia y razonabilidad en tarifas del sistema eléctrico de Puerto Rico y establecer las guías, estándares, prácticas y procesos a seguir para los procesos para la compra de energía, la modernización de plantas o instalaciones generadoras de energía, disponiéndose que todo contrato de compraventa de energía deberá cumplir con los estándares, términos y condiciones establecidos por el NEPR de conformidad con lo dispuesto en la Ley de Política Pública Energética y esta Ley.

[…]

(k) Revisar y aprobar políticas, planes estratégicos y planes a corto, mediano y largo plazo relacionados con la planificación integrada de recursos energéticos en Puerto Rico, y fiscalizar el cumplimiento con los mismos;

[…]

(n) Aprobar, revisar y, según fuere aplicable, modificar las tarifas o cargos que cobren las compañías de servicio eléctrico o el Contratante de la red de transmisión y distribución en Puerto Rico por cualquier asunto directa o indirectamente relacionado con la prestación del servicio eléctrico;

[…]

(nn) Demandar y ser demandada en reclamaciones o causas de acción a nombre propio en el Tribunal de Primera Instancia del Gobierno de Puerto Rico contra cualquier persona natural o jurídica que incumpla o interfiera con los requisitos, fines y objetivos de esta Ley, o en cualquier otro foro administrativo del Gobierno de Puerto Rico. A tales fines, se le reconoce legitimación activa al Negociado para interponer los recursos necesarios, incluyendo y sin limitarse a solicitar un desacato contra cualquier persona natural o jurídica que incumpla los mandatos contenidos bajo la jurisdicción del Negociado de Energía, ante el foro judicial para asegurar el cabal cumplimiento con la política pública establecida en esta Ley;

(oo) Adoptar reglas, pronunciamientos y reglamentos que sean necesarios para cumplir con sus deberes, emitir órdenes y establecer multas para dar cumplimiento a las facultades que por ley se le conceden, y para la implementación de esta Ley. Los reglamentos se adoptarán de conformidad con la Ley 38-2017, según enmendada, conocida como "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico".

[…]

22 LPRA sec. 1054b.

Por su parte, una vez fue anunciada la privatización de la AEE, se aprobó la *Ley de Política Pública Energética de Puerto Rico*, Ley Núm. 17-2019, según enmendada, 22 LPRA sec. 1141 *et seq.* El propósito de este estatuto fue facilitar la entrega de las operaciones de la AEE a entidades privadas. En específico, abrió el mercado del

sistema eléctrico de Puerto Rico a la empresa privada, **sujeto a la regulación del NEPR**, al disponer que la AEE no poseería el derecho exclusivo de producir, transmitir, distribuir y comercializar el suministro de energía eléctrica. 22 LPRA sec. 1141b.

### B. Autoridad para las Alianzas Público-Privadas

La privatización de las operaciones de la AEE se rige por varios estatutos, incluyendo la *Ley de Alianzas Público-Privadas*, Ley Núm. 29-2009, según enmendada, 27 LPRA sec. 2601 *et seq.*, y la *Ley para Transformar el Sistema Eléctrico de Puerto Rico*, Ley Núm. 120-2018, según enmendada, 22 LPRA sec. 1111 *et seq.* El primer estatuto mencionado establece el marco regulatorio bajo el cual la AAPP lleva a cabo los procesos de privatización de entidades gubernamentales, y la política pública del Gobierno de Puerto Rico respecto a la creación de Alianzas Público-Privadas mediante contrato. 27 LPRA sec. 2604. Por otro lado, la segunda ley esbozada creó el andamiaje jurídico para los contratos de Alianzas Público-Privadas de la AEE.

A saber, la *Ley para Transformar el Sistema Eléctrico de Puerto Rico*, *supra*, provee para la venta o traspaso de los activos o funciones de la AEE, al definir las transacciones de la AEE como toda aquella mediante la cual se "establezca una o más Alianzas con respecto a cualquier función, servicio o instalación de la AEE o un Contrato de

Venta de los activos de la AEE relacionados a la generación de energía". 22 LPRA sec. 1113(m). De igual manera, al amparo de ambas leyes mencionadas, la AAPP es la entidad facultada para llevar a cabo cualquier transacción de la AEE. 22 LPRA sec. 1115(b). Además, la AAPP es la encargada de supervisar el desempeño y cumplimiento del contratante bajo un contrato de alianza, y rendir informes anuales sobre el desarrollo de los proyectos. 27 LPRA sec. 2609(d).

Por su parte, una vez la AAPP ejecuta una transacción de la AEE, es necesario que el NEPR emita un Certificado de Cumplimiento de Energía para que esta se perfeccione. 22 LPRA sec. 1118(a). Así las cosas, al momento de consumar una transacción de la AEE, la AAPP y el NEPR son las agencias encargadas de preparar un plan de trabajo para la supervisión del desempeño y cumplimiento de la AEE y la entidad contratada, conforme cada contrato de alianza o de venta. 22 LPRA sec. 1118(d).

Así, al amparo de la *Ley para Transformar el Sistema Eléctrico de Puerto Rico*, *supra*, el 22 de junio de 2020, la AAPP, LUMA y la AEE firmaron el OMA.

C. **Oficina Independiente de Protección al Consumidor**

La *Ley de Transformación y ALIVIO Energético*, *supra*, creó la OIPC, con el propósito de educar, asistir y representar a los clientes de los servicios bajo la jurisdicción de la Junta Reglamentadora de Servicio Público

de Puerto Rico. 22 LPRA sec. 1054nn(a). En específico, la Exposición de Motivos del referido estatuto dispone la importancia de la OIPC como ente fiscalizador del sistema energético de Puerto Rico:

Como aspecto importante para garantizar la participación y fiscalización ciudadana en el sistema energético, se crea por virtud de esta Ley la Oficina Independiente de Protección al Consumidor ("OIPC"), **cuya función será representar y defender los intereses de los consumidores de los servicios energéticos, tanto ante la Autoridad como ante la entidad reguladora.** La OIPC tendrá el deber, entre otros, de ser defensor y portavoz de los intereses de los clientes en todos los asuntos que estén ante la Comisión de Energía, incluyendo los asuntos relacionados a las disputas sobre facturas con la AEE. Además, tendrá el deber de coordinar la participación ciudadana en el proceso interno de revisión de tarifas de la Autoridad y ante la Comisión de Energía, según sea el caso, de modo que se garantice una participación activa en este proceso. Con este nuevo ente, se garantiza que el público no se sienta indefenso ante el poder y tamaño de la AEE y otros generadores de energía.

(Énfasis suplido).

Entre los poderes y deberes delegados a la OIPC por la Asamblea Legislativa, la agencia es la encargada de lo siguiente:

[…]

(d) Presentar querellas o recursos legales ante el Negociado de Energía, el Negociado de Telecomunicaciones de Puerto Rico y el Negociado de Transporte y otros Servicios Públicos de Puerto Rico a nombre y en representación de clientes, que no tengan otra representación legal, en relación con controversias sobre cualquier asunto que afecte el servicio, tarifa o en cualquier otro asunto que afecte los intereses o derechos de los clientes de servicio eléctrico, telecomunicaciones y transporte. Previo a radicar querellas en representación de

clientes deberá verificar que el cliente haya cumplido con las disposiciones pertinentes administrativas para su reclamo. Si existiera un conflicto de interés entre distintas clases de clientes con respecto a alguna causa de acción o controversia, la prioridad de la OIPC será representar y defender a los clientes residenciales y comerciales con pequeños negocios;

[…]

(h) **Participar o comparecer como parte interventora en cualquier acción, ante cualquier agencia gubernamental del Gobierno de Puerto Rico o del Gobierno Federal con jurisdicción, relacionada con tarifas, facturas, política pública o a cualquier otro asunto que pueda afectar a los consumidores y/o clientes de servicio eléctrico**, de telecomunicaciones y de transporte;

(i) **Participar o comparecer como parte peticionaria o como parte interventora en cualquier acción ante el Tribunal General de Justicia o ante los tribunales de la jurisdicción federal, relacionada con tarifas, facturas, política pública o a cualquier otro asunto que pueda afectar a los clientes de servicio eléctrico**, telecomunicaciones y transporte;

[…]

22 LPRA sec. 1054qq. (Énfasis suplido).

Habiendo esbozado el trasfondo histórico del sistema de energía eléctrica de Puerto Rico, procedemos a atender los asuntos jurisdiccionales.

## III

### A. Legitimación activa

La doctrina de legitimación activa o *standing* se define como "la capacidad que se le requiere a la parte [querellante o demandante] de una acción para comparecer como litigante ante el tribunal, realizar con eficiencia

actos procesales y, de esta forma, obtener una sentencia vinculante". *Rivera et al. v. Torres et al.*, 214 DPR 111, 133 (2024) (citando a *Hernández, Santa v. Srio. de Hacienda*, 208 DPR 727, 739 (2022)). De ordinario, quien solicita un remedio judicial debe demostrar que: (1) sufrió un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal razonable entre el daño y la acción ejercida; y (4) la causa de acción surge al palio de la Constitución o de una ley. *Amadeo Ocasio et al. v. Gobernador et al.*, 211 DPR 278, 285 (2023) (Sentencia).

No obstante, en el ejercicio de determinar si las partes tienen legitimación activa para instar una acción, los tribunales debemos analizar el cumplimiento de los criterios mencionados, **salvo cuando exista un estatuto que expresamente confiera legitimación activa**. *Rivera et al. v. Torres et al., supra.* Por tanto, al momento de evaluar la existencia de legitimación activa estamos llamados a examinar si la Asamblea Legislativa la ha otorgado por la vía estatutaria. Es decir, **el primer paso es determinar si existe legitimación estatutaria**. *Rivera et al. v. Torres et al., supra.*

**B. Legitimación estatutaria**

El Tribunal Supremo de Puerto Rico ha interpretado la figura de la legitimación estatutaria desde el año 1974. *Salas Soler v. Srio. de Agricultura*, 102 DPR 716 (1974).

A saber, esta surge cuando un estatuto "de manera expresa o implícita, otorga a una persona legitimación activa para instar una acción judicial, independientemente de que esta haya sufrido un daño particular, más allá del mero hecho de la violación de la ley". J. M. Farinacci Fernós, *Cualquier persona: La facultad plenaria de la Asamblea Legislativa para otorgar legitimación activa por la vía estatutaria*, 84 Rev. Jur. UPR 359, 360 (2015).

Dicho de otro modo, cuando la Asamblea Legislativa concede legitimación activa de manera estatutaria, el promovente está facultado a presentar su causa de acción, sujeto únicamente a las exigencias incluidas en ese estatuto, e independientemente haya sufrido un daño real y palpable. *Rivera et al. v. Torres et al.*, *supra*. De esta manera, al evaluar la concesión de legitimación estatutaria, estamos llamados a auscultar la voluntad legislativa en cuanto a las circunstancias que deben estar presentes para que una parte pueda presentar un asunto ante la consideración de los tribunales. Íd.

Nuestra interpretación de la doctrina de legitimación estatutaria ha sido consistente. En *Salas Soler v. Srio. de Agricultura*, *supra*, partimos de la premisa que la Asamblea Legislativa tenía plena facultad para otorgar legitimación activa en cualquier circunstancia, y que, por consiguiente, nos correspondía analizar el lenguaje estatutario para determinar el nivel de legitimación otorgado por la legislatura. J. M. Farinacci Fernós, *supra*,

en la pág. 139. Posteriormente, al atender asuntos donde la legitimación estatutaria de una de las partes ha estado en controversia, hemos aplicado la misma metodología. Íd.; *Rivera et al. v. Torres et al.*, *supra*, en la pág. 134; *Hernández Torres v. Gobernador*, 129 DPR 824, 835-836 (1992). Así las cosas, **una vez reconocemos la existencia de la legitimación estatutaria que se reclama, los tribunales estamos llamados a analizar el alcance de la misma**, interpretando la intención del legislador.

### i. Legitimación activa del DACo

En nuestro ordenamiento jurídico, la ley orgánica de una agencia administrativa es el mecanismo legal mediante el cual la Asamblea Legislativa autoriza y delega los poderes necesarios para que ésta actúe conforme el propósito de su creación. *D.A.Co. v. Fcia. San Martín*, 175 DPR 198, 203 (2009) (citando a *Amieiro González v. Pinnacle Real Estate*, 173 DPR 363, 371 (2008)). A su vez, hemos afirmado reiteradamente que, al interpretar el alcance de los poderes delegados a una agencia, no debemos limitar a una interpretación restrictiva el análisis de su ley habilitadora. *D.A.Co. v. Fcia. San Martín*, *supra*, en las págs. 203-204.

En lo pertinente, según la exposición de motivos de su ley orgánica, el propósito primordial del DACo es vindicar, proteger e implementar los derechos del consumidor. *Ley Orgánica del Departamento de Asuntos del*

*Consumidor*, Ley Núm. 5 de 23 de abril de 1973, según enmendada, 3 LPRA sec. 341 *et seq*. (Ley Orgánica del DACo). Además de ser una agencia especializada en vindicar los derechos del consumidor de manera firme y agresiva, el DACo fue creado para ser el organismo capaz de sacar a los consumidores de su estado de indefensión, fiscalizar el cumplimiento de las leyes dirigidas a protegerlos, y proveerles una representación adecuada en la defensa de sus derechos. Íd.

Mediante el Artículo 6 de la referida ley, la legislatura le impuso al Secretario o Secretaria del DACo el deber ministerial de representar a los consumidores de Puerto Rico ante entidades privadas u organismos públicos en cualquier asunto que afecte o pudiese afectar sus intereses. 3 LPRA sec. 341e(e). Además, este funcionario público también **goza de la facultad para comparecer por y en representación de los consumidores, ante los tribunales del Estado Libre Asociado de Puerto Rico y del gobierno de los Estados Unidos, en cualquier procedimiento que afecte o pueda afectar los intereses del consumidor** en general, de grupos de consumidores o de cualquier consumidor en particular. 3 LPRA sec. 341e(f).

De igual manera, la Ley Orgánica de DACo establece que el DACo es la agencia encargada de promover y velar por el cumplimiento de todas las leyes, reglas, reglamentos y órdenes que afecten los intereses del consumidor, en coordinación con las demás agencias y departamentos de

Puerto Rico. 3 LPRA sec. 341e(s). Esto incluye la **facultad de interponer cualquier remedio legal que sea necesario para hacer efectivos los propósitos de su ley habilitadora**. 3 LPRA sec. 341e(i).

### C. Parte indispensable

En cuanto a la figura de parte indispensable, la Regla 16.1 de Procedimiento Civil establece que "[l]as personas que tengan un interés común sin cuya presencia no pueda adjudicarse [una] controversia, se harán partes y se acumularán como demandantes o demandadas, según corresponda". 32 LPRA Ap. V., R. 16.1. Este precepto forma parte del principio constitucional que dispone que "ninguna persona será privada de su libertad o propiedad sin [un] debido proceso de ley". Art. II, Sec.7, Const. PR, LPRA, Tomo 1.

A su vez, la Regla 16.1, *supra*, encarna el principio fundamental de incluir a todas las partes con interés para que, así, el decreto judicial que se emita sea completo. *Oriental Bank v. Pagán Acosta y otros*, 2024 TSPR 133, 215 DPR ___ (2024) (citando a *López García v. López García,* 200 DPR 50, 64 (2018)). Sobre el referido interés, hemos expresado en numerosas ocasiones que **el mismo debe ser uno real e inmediato, y que no basta con que sea un interés especulativo ni futuro**. *Oriental Bank v. Pagán Acosta y otros*, *supra*; *Allied Mgmt. Group v. Oriental Bank*, 204 DPR 374, 389-390 (2020); *López García v. López García, supra*.

En cuanto a la ausencia de una parte indispensable en un pleito, hemos sentenciado que su comparecencia "es un interés tan fundamental, que constituye una defensa irrenunciable que puede presentarse en cualquier momento durante el proceso", e incluso, los foros apelativos podemos y debemos levantarla *motu proprio*. *Oriental Bank v. Pagán Acosta y otros*, *supra* (citando a *López García v. López García, supra*, en la pág. 65). Por consiguiente, toda sentencia dictada en ausencia de una parte indispensable es nula, pues priva al tribunal de jurisdicción sobre la persona sobre la cual se pretende hacer valer un dictamen. *Oriental Bank v. Pagán Acosta y otros*, *supra* (citando a *García Colón et al. v. Sucn. González,* 178 DPR 527, 539 (2010)).

Así, al momento de interpretar la Regla 16.1 de Procedimiento Civil, *supra*, es menester que los tribunales evaluemos juiciosamente, con un enfoque pragmático, las particularidades de cada caso, y los derechos de las partes que no están presentes en el pleito, pero cuyos derechos podrían verse afectados. *Oriental Bank v. Pagán Acosta y otros*, *supra* (citando a J.A. Cuevas Segarra, *Tratado de derecho procesal civil*, 2da ed., Estados Unidos, Pubs. JTS, 2011, T. IV, págs. 1415-1418).

## IV

Previo a adentrarnos en el derecho sustantivo de la controversia ante nos, debemos atender, como cuestión de

umbral, varios asuntos jurisdiccionales que se plantearon en los escritos. A saber, que estamos privados de la jurisdicción para atender el pleito de epígrafe, debido a que el DACo: (1) no tiene legitimación estatutaria para representar los intereses de los consumidores del servicio eléctrico, ya que esa facultad le corresponde a la OIPC; (2) no tiene legitimación activa para instar el pleito de epígrafe por razón de no demostrar que sufrió un daño real y palpable; y (3) omitió acumular a la AAPP como parte indispensable. **Adelantamos que no le asiste la razón.**

Sabido es que, al momento de evaluar la legitimación activa que tiene una parte para instar un pleito, el primer paso es reconocer si la Asamblea Legislativa la ha otorgado por la vía estatutaria. Por tanto, para resolver si el DACo está capacitado para presentar la causa de acción ante nos, debemos determinar inicialmente si existe algún estatuto que expresamente le confiera legitimación activa para ello. A saber, estamos llamados a auscultar la voluntad legislativa en cuanto a las circunstancias que deben estar presentes para que DACo pueda presentar el recurso ante nuestra consideración.

Un examen de la Ley Orgánica del DACo, *supra*, revela que el propósito primordial del DACo es vindicar, proteger e implementar los derechos del consumidor, siendo esta la agencia encargada de sacar al consumidor de su estado de indefensión y proveerle una representación adecuada en la defensa de todos sus derechos. Así, mediante el Art. 6 del

referido estatuto, la Asamblea Legislativa le impuso al DACo el deber de "representar al público consumidor ante cualquier entidad privada u organismo público **en cualquier asunto que afecte o pueda afectar los intereses del consumidor**". 3 LPRA sec. 341e(e).

Por ser la entidad encargada de defender los derechos de los consumidores en Puerto Rico, la Legislatura le concedió al DACo la legitimación estatutaria para comparecer a los tribunales, al disponer que es la agencia con la facultad y el deber para:

> **Comparecer por y en representación de los consumidores ante cualquier tribunal,** junta o comisión, organismo administrativo, departamento, oficina o agencia del Estado Libre Asociado de Puerto Rico y/o del gobierno de los Estados Unidos **en cualquier vista, procedimiento o asunto que afecte o pueda afectar los intereses del consumidor** en general, de grupos de consumidores o de cualquier consumidor en particular.

3 LPRA sec. 341e(f). (Énfasis suplido).

De esta manera, no cabe duda de que la Asamblea Legislativa expresamente delegó en el DACo la responsabilidad de promover y velar por el cumplimiento de todas las leyes, reglas, reglamentos y órdenes que afecten los intereses del consumidor. 3 LPRA sec. 341e(s). Para ello, **le impuso el deber y la facultad de interponer cualquier remedio legal que sea necesario para hacer efectivos los propósitos de su ley habilitadora,** teniendo siempre como norte la protección de los derechos del consumidor puertorriqueño. 3 LPRA sec. 341e(i).

Por consiguiente, al interpretar la intención legislativa detrás de la aprobación de la Ley Orgánica del DACo, *supra*, **es menester que reconozcamos la legitimación estatutaria conferida a la agencia por la Asamblea Legislativa para comparecer a los tribunales, siempre y cuando el asunto en cuestión afecte o pueda afectar los derechos del consumidor.** En lo pertinente a la controversia que nos ocupa, el DACo sostiene que la Resolución del NEPR tiene el efecto de privar a los consumidores del servicio eléctrico de su derecho a reclamar daños que puedan surgir a raíz de la negligencia de LUMA, conforme establece nuestro Código Civil. Así, por entender que el DACo presentó el recurso de epígrafe con miras a vindicar un derecho reconocido por nuestro ordenamiento jurídico, y habiéndolo instado en representación del consumidor, reiteramos que tiene legitimación estatutaria para hacerlo.

A su vez, estamos en desacuerdo con el planteamiento de LUMA en cuanto a que, al amparo de la *Ley de Transformación y ALIVIO Energético*, *supra*, se faculta exclusivamente a la OIPC a comparecer judicialmente en asuntos relacionados a los clientes de servicio eléctrico. Si bien es cierto que la OIPC fue creada con el propósito de representar y defender los intereses de los consumidores de los servicios energéticos de Puerto Rico, cuando se plantean cuestiones de naturaleza tarifaria y controversias que requieran peritaje técnico especializado, lo que se

examina en el caso de autos son principios generales del derecho civil y contractual, como la validez y alcance de cláusulas de exención de responsabilidad o la aplicabilidad del principio de legalidad para lo que está facultado DACo.

Así, tras reconocer la legitimación estatutaria conferida al DACo por su ley habilitadora, procedemos a atender el asunto de la falta de parte indispensable. En síntesis, LUMA sostiene que la AAPP es parte indispensable del pleito, puesto que el DACo está solicitando la nulidad de una cláusula establecida en un contrato en donde la AAPP funge como administrador. En específico, aduce que, como administrador, la AAPP es responsable de supervisar el cumplimiento de este contrato, en la forma prevista y con sujeción a los términos y condiciones establecidos en el OMA. Por tanto, argumenta que la AAPP tiene un interés real e inmediato en el pleito, por lo cual, sin su comparecencia, estaríamos impedidos de emitir un dictamen que abarque un remedio completo.

Por su parte, el DACo argumenta que el NEPR, LUMA y la AEE son las únicas partes verdaderamente indispensables en el pleito ante nos. Indica que, a pesar de que la AAPP fue firmante del OMA, la Sección 4.1(g) de este únicamente establecía la obligación de solicitar al NEPR un relevo de responsabilidad. Es decir, arguye que la cláusula del contrato por sí sola no confiere inmunidad alguna, sino que fue el NEPR quien ejerció su jurisdicción primaria y exclusiva sobre tarifas y términos de servicio para acoger

la petición de inmunidad mediante la Resolución del NEPR. Por consiguiente, al no poder obligar al Negociado a conceder la inmunidad, ni tampoco controlar su alcance o contenido, el DACo plantea que la AAPP podría considerarse una parte interesada, pero no indispensable.

Como expresamos, para que una parte sea considerada indispensable, debe tener un interés real e inmediato en el pleito, y que no puede tratarse de meras especulaciones o un interés futuro. *Allied Mgmt. Group v. Oriental Bank*, *supra*. Por tanto, como cuestión de umbral, tenemos la obligación de evaluar si los derechos de la AAPP se verán afectados, y de qué manera, al no estar presente en el pleito de epígrafe.

Surge del expediente que la AAPP fue firmante del OMA, en calidad de administrador encargado de supervisar el cumplimiento de las partes con los términos estipulados. Por tanto, la AAPP está encargada de supervisar el desempeño y cumplimiento de la AEE y LUMA, y rendir informes anuales sobre el desarrollo de los proyectos. 27 LPRA sec. 2609(d). Siendo este su rol principal, consideramos que la AAPP no es una parte indispensable por el mero hecho de haber firmado en calidad de administrador. Es decir, no surge cuál es el interés real e inmediato que tiene la AAPP en el pleito. En conclusión, justipreciamos que la AAPP no es una parte indispensable en el pleito ante nos, por la sencilla razón de que, en calidad de administrador, no posee un interés real e inmediato en el mismo. Sin duda,

los derechos y las obligaciones de la AAPP permanecerán inalterados.

Aclarados los aspectos de legitimación y parte indispensable, procedemos a esbozar el derecho sustantivo aplicable a la controversia ante nuestra consideración.

**V**

**A. Sentencia declaratoria**

Por su parte, la sentencia declaratoria es un mecanismo que está disponible, aunque existan otros remedios, y tiene la eficacia de una sentencia o resolución definitiva. *Rosario Rodríguez v. Rosado Colomer et al.*, 208 DPR 419, 428 (2021) (citando a *Senado de PR v. ELA*, 203 DPR 62, 71 (2019)). En el pasado, la hemos definido como un "mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra quien la solicita". *Rosario Rodríguez v. Rosado Colomer et al.*, *supra*, en la pág. 427 (citando a *Senado de PR v. ELA*, *supra*); *Beltrán Cintrón et al. v. ELA et al.*, 204 DPR 89, 109 (2020) (citando a *Senado de PR v. ELA*, *supra*).

Así pues, este recurso extraordinario puede ser dictado en todo proceso judicial donde "[l]os hechos alegados demuestran que existe una controversia sustancial entre partes que tienen intereses legales adversos, sin que

medie lesión previa de los mismos con el propósito de disipar la incertidumbre jurídica y contribuir a la paz social". R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6ta ed., San Juan, Ed. LexisNexis, 2017, Sec. 6001, pág. 623.

A su vez, el mecanismo de la sentencia declaratoria provee para que toda persona cuyos derechos fuesen afectados por un estatuto, ordenanza municipal, contrato o franquicia, pueda solicitar una determinación sobre cualquier divergencia en la interpretación o validez de estos, y que se dicte una declaración de los derechos, estados u otras relaciones jurídicas que de aquellos se deriven. Regla 59.2 de Procedimiento Civil, 32 LPRA Ap. V. Respecto a los contratos, estos pueden ser interpretados antes o después de haber sido infringidos. Íd.

## B. Separación de poderes

La doctrina de separación de poderes constituye una garantía esencial de la democracia. La misma está consagrada en la Sección 2 del Artículo I de la Constitución de Puerto Rico y dispone que "[e]l Gobierno del Estado Libre Asociado tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico". Art. I, Sec. 2, Const. PR, LPRA, Tomo 1. En el pasado hemos mencionado que "[e]n el Estado moderno la separación de poderes conlleva un

sistema de contrapesos y de sabia utilización del poder discrecional de cada rama con el propósito de asegurar un 'equilibrio dinámico' que asegure el funcionamiento efectivo del sistema republicano de gobierno". *Pueblo v. González Malavé*, 116 DPR 578, 599-600 (1985).

Así, el principio de separación de poderes, además de enmarcar el ámbito de acción de las ramas de gobierno, asegura que ninguna de las tres ramas domine o interfiera de forma indebida con la otra. *Senado v. Tribunal Supremo y otros*, 208 DPR 115, 135 (2021); *Rodríguez Casillas et al. v. Colegio*, 202 DPR 428, 450 (2019). Después de todo, el propósito de la separación de poderes es proteger la libertad de los ciudadanos y garantizar la independencia de cada una de las ramas de gobierno. *Díaz Carrasquillo v. García Padilla*, 191 DPR 97, 110 (2014).

Asimismo, ante nuestros deberes como Tribunal de última instancia, resulta obligatorio siempre tener consciencia de "las delicadas fronteras constitucionales que existen entre las tres (3) ramas de gobierno". *A.A.R., Ex parte*, 187 DPR 835, 855 (2013). Ante ello, cabe destacar que, "en el desempeño normal de nuestras funciones revisoras bajo el sistema de separación de poderes, los tribunales debemos actuar con prudencia y deferencia a la voluntad legislativa, siempre que la misma esté enmarcada dentro del esquema constitucional". *Rodríguez Casillas et al. v. Colegio, supra,* en las págs. 450-451 (citando a *P.I.P. v. C.E.E.*, 120 DPR 580, 611 (1988)). Esto se debe

a que "[c]uando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa". *Cuevas v. Ethicon Div. Of J&J Prof. Co.,* 148 DPR 839, 850 (1999).

De este modo, cuando se presenta un conflicto entre los poderes constitucionales de cada rama, le corresponde al poder judicial definir sus límites. En ese sentido, es nuestra tarea "distinguir entre 'facultades que integran la entraña misma del sistema y poderes trasladables, por razones de peso, a otras ramas'". *Nogueras v. Hernández Colón,* 127 DPR 405, 426 (1990) (citando a *In re Rodríguez Torres,* 106 DPR 698, 709 (1978)). Luego, teniendo en consideración las circunstancias históricas prevalecientes, debemos "delimitar los contornos de los poderes públicos para evitar la concentración indebida de poderes y promover el más eficiente funcionamiento del sistema". Íd., págs. 426-427.

## C. Facultad de la Asamblea Legislativa de otorgar inmunidad

En el ámbito de la responsabilidad civil extracontractual, la "inmunidad dispuesta por ley no es meramente una defensa; se trata más bien de la inexistencia de una causa de acción". *Rodríguez Ruiz v. Hosp. San Jorge,* 169 DPR 850, 861 (2007). En consecuencia, una persona que goza de inmunidad "no puede ser objeto de un litigio, independientemente de que haya realizado un acto o una

omisión, culposo o negligente". *Rodríguez Figueroa et al. v. Centro de Salud*, 197 DPR 876, 884 (2017). La razón de ser de esta doctrina no se encuentra en la conducta del individuo, sino en el hecho de que la inmunidad es una prerrogativa de la Asamblea Legislativa atendiendo a consideraciones de política pública que trascienden los límites de los actos u omisiones particulares. *Rodríguez Figueroa et al. v. Centro de Salud, supra,* en la pág. 884 (citando a *Romero Arroyo v. E.L.A.,* 127 DPR 724, 745 (1991)).

En nuestro ordenamiento jurídico, existen distintos supuestos en los cuales se ha reconocido la inmunidad "por razones de orden público o de política pública". *Consejo Cond. Plaza del Mar v. Jetter,* 169 DPR 643, 656 (2006). Un ejemplo de ello es la inmunidad patronal, la inmunidad interfamiliar, la inmunidad condicionada de jueces y fiscales, entre otros tipos de inmunidad. Como corolario, hemos enfatizado antes que, "salvo disposición expresa que conceda inmunidad a un grupo o sector de la población, debemos entender que éstos se encuentran sujetos a la imposición de responsabilidad civil extracontractual por sus actos u omisiones negligentes o culposas". Íd., en la pág. 657.

### D. Obligaciones y contratos

Las obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos u omisiones ilícitos en los

que intervenga culpa o negligencia.[6] 31 LPRA ant. sec. 2992. En cuanto a las obligaciones contractuales, estas tienen fuerza de ley, según lo estipulado entre las partes contratantes. 31 LPRA ant. sec. 2994. Por consiguiente, ni la validez ni el cumplimiento de las obligaciones contractuales pueden dejarse al arbitrio de uno de los contratantes. 31 LPRA ant. sec. 3373.

Un contrato existe desde que una o varias personas se obligan a dar alguna cosa o prestar algún servicio. 31 LPRA ant. sec. 3371. Para que tenga eficacia jurídica, en el contrato deben concurrir los requisitos de objeto, causa de la obligación, y el consentimiento de los contratantes. 31 LPRA ant. sec. 3391. Así, siempre que concurran estas condiciones esenciales para su validez, los contratos son obligatorios. 31 LPRA ant. sec. 3451. Es decir, las partes contratantes se obligan al cumplimiento de lo expresamente pactado, al igual que a todas las consecuencias que, según su naturaleza, sean conformes a la ley, al uso y a la buena fe. LPRA ant. sec. 3375.

En más de una ocasión hemos establecido que, en nuestro ordenamiento jurídico, rige el principio de libertad de contratación o la autonomía de la voluntad. *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 995 (2024);

---

[6] Si bien es cierto que la controversia ante nos surge por actos ejecutados en el año 2021, estos fueron llevados a cabo en virtud de la disposición de un contrato firmado antes de que entrara en vigor el Código Civil de Puerto Rico de 2020, 31 LPRA 5311 et seq. Por tanto, el Código Civil de 1930, 31 LPRA ant. sec. 1 et seq., es el cuerpo estatutario aplicable a los hechos de este caso. 31 LPRA secs. 11717, 11718.

*Coop. Sabaneña v. Casiano Rivera*, 184 DPR 169, 173 (2011).
En otras palabras, mediante el principio de *pacta sunt
servanda*, las partes contratantes son libres de establecer
todos los pactos, cláusulas y condiciones que estimen
convenientes, **siempre que no sean contrarios a las leyes,
la moral o el orden público**. 31 LPRA ant. sec. 3372.

### E. Derecho a remedios por daños por culpa o negligencia

En materia de obligaciones, sabido es que los actos y
omisiones culposos o negligentes generan responsabilidad
civil extracontractual.  En específico, el Artículo 1536
del Código Civil de Puerto Rico del 2020, 31 LPRA sec.
10801, dispone que toda persona que por culpa o negligencia
cause daño a otra, está obligada a reparar el daño causado.
En cuanto a esta norma, hemos reiterado que la
indemnización de un daño solamente procede cuando concurren
los elementos de (1) acto u omisión culposa o negligente;
(2) daño real causado al reclamante; y (3) relación causal
entre el acto u omisión y el daño ocasionado. *Sucn. Mena
Pamias et al. v. Mélendez et al.*, 212 DPR 758, 768 (2023);
*Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010).

En lo pertinente a personas o entidades dedicadas a
generar y distribuir electricidad en Puerto Rico, desde
mediados del siglo XX, hemos establecido que, atendido el
carácter inherentemente peligroso de ese elemento, estas
deben ejercer el más alto grado de cuidado para evitar
causar daños. *Torres Solís et al. v. A.E.E. et als.*, 136

DPR 302, 311 (1994); *Ramos v. Aut. Fuentes Fluviales*, 86 DPR 603, 609 (1962). Sin embargo, eso no significa que responden en cualquier caso en que se cause un perjuicio, sino que es requisito que el daño haya sido producido por su culpa o negligencia, al omitir desplegar un grado de cuidado en proporción al riesgo o peligro envuelto. *Ramos v. Aut. Fuentes Fluviales*, *supra*. Así, este grado de cuidado se extiende más allá de la instalación, mantenimiento y operación del equipo utilizado para la generación y distribución de electricidad. A saber, incluye la obligación de realizar una inspección adecuada para descubrir defectos y situaciones de peligro o riesgo para el público, y tomar las debidas precauciones para asegurarse que no surjan. Íd.

No obstante, siendo la generación y distribución de electricidad un servicio de primera necesidad, hemos reiterado que esta no debe impedirse requiriendo que se adopte toda protección concebible por la mente humana a fines de evitar todos los riesgos posibles, sin importar su imprevisibilidad. Íd., en la pág. 610. Es decir, el beneficio social proporcionado por la electrificación no puede derrotarse mediante la exigencia de una responsabilidad absoluta a las entidades encargadas de generar y distribuir electricidad. Íd.

**VI**

**A**

La controversia ante nos se circunscribe a determinar si la Sección 4.1(g) del OMA y la Resolución del NEPR le conceden inmunidad a LUMA al otorgar un relevo de responsabilidad frente a reclamaciones de los consumidores por daños causados por actos negligentes, interrupciones del servicio y fluctuaciones en el servicio eléctrico. En virtud del recurso de certificación intrajurisdiccional de epígrafe, decidimos expedirlo por entender que tenemos ante nuestra consideración una controversia constitucional de alto interés público.

Comenzamos expresándonos sobre si la cláusula impugnada por el DACo, a saber, la sección 4.1(g) del OMA y la Resolución del NEPR, antes citadas, en efecto, le conceden la referida inmunidad a LUMA. En específico, en la Resolución del NEPR, el Negociado determinó, entre otras cosas, que la AEE, sus directores, oficiales, empleados, agentes y contratistas (incluyendo a LUMA y sus respectivos directores, oficiales, empleados, agentes y contratistas) **no serán responsables, contractual ni extracontractualmente, frente a los clientes o a cualquier usuario que reciba energía eléctrica o servicio de electricidad, por cualquier pérdida que surja de cualquier forma o en cualquier relación con la operación del Sistema de Transmisión y Distribución y la prestación del servicio eléctrico, incluyendo negligencia ordinaria.**

Según hemos reiterado, la inmunidad "no es meramente una defensa, se trata más bien de la inexistencia de una causa de acción". *Rodríguez Ruiz v. Hosp. San Jorge, supra*, pág. 861. Ello implica que, quien goza de inmunidad no puede ser objeto de litigio sin importar si realizó un acto u omisión, culposo o negligente. *Rodríguez Figueroa et al. v. Centro de Salud*, *supra*, en la pág. 884. En el caso ante nos, el NEPR aprobó una disposición cuyo efecto es precisamente suprimir la posibilidad de entablar una reclamación civil contra LUMA por actos negligentes en la prestación del servicio eléctrico.

De hecho, el texto mismo de la cláusula revela que no se trata de una mera delimitación tarifaria, sino que elimina de manera general toda posibilidad de responsabilidad civil por negligencia ordinaria. En específico, al indicar que LUMA y su personal "***shall not be liable contractually or extra-contractually***", la Resolución del NEPR impide el acceso efectivo de los consumidores a los tribunales, ya que extiende la exoneración a todo tipo de responsabilidad civil, contractual o extracontractual. Por lo tanto, es indudable que el texto de la cláusula impugnada impone una barrera jurídica que impide el acceso efectivo de los consumidores a los tribunales, lo cual, en la práctica, equivale a una inmunidad hacia LUMA.

Ahora bien, con anterioridad hemos expresado que, salvo disposición expresa de la Asamblea Legislativa que

conceda inmunidad a un grupo o sector de la población, éstos se encuentran sujetos a la imposición de responsabilidad civil extracontractual por sus actos u omisiones negligentes o culposas. *Consejo Cond. Plaza del Mar v. Jetter*, *supra*, en la pág. 657. De esta manera, la validez de una inmunidad está sujeta a que la misma haya sido concedida por el legislador.

Cónsono con lo esbozado, LUMA argumenta que la limitación de responsabilidad de compañías de servicio eléctrico que ofrecen servicios esenciales responde a la delegación de poderes de la Asamblea Legislativa al NEPR mediante la *Ley de Transformación y ALIVIO Energético*, *supra*. En otras palabras, LUMA asegura que, al amparo de esta ley, el NEPR ostenta poderes sobre fijación de tarifas, lo que sin duda, y a su entender, incluye el mecanismo de limitación de responsabilidad o lo que, a nuestro juicio, resulta en la inmunidad concedida.

Por su parte, el DACo argumenta que el Negociado intentó establecer una inmunidad casi absoluta por la vía contractual y administrativa, sin que hubiese ninguna intervención de la Legislatura. En su opinión, ello vulnera el principio constitucional de separación de poderes, pues es la Asamblea Legislativa la rama de gobierno con la autoridad para delegar a una agencia administrativa la facultad de conferirle inmunidad a entidades privadas como LUMA.

Por consiguiente, **tenemos ante nuestra consideración una controversia constitucional relacionada estrictamente a la validez de una cláusula aprobada por el Negociado que otorga inmunidad a LUMA al liberarle de responsabilidad por daños relacionados con la operación del sistema eléctrico.**

Acotada así la controversia, advertimos que no nos corresponde en esta etapa adjudicar el efecto, si alguno, que tendría la invalidez de la cláusula sobre la tarifa mensual. Aclaramos que, por disposición expresa de ley, el Negociado es la entidad facultada para autorizar modificaciones o aumentos en la tarifa eléctrica. Por lo tanto, corresponde entonces al NEPR determinar si el pago de indemnizaciones en daños constituye un costo operacional autorizado para propósitos de revisión de tarifa eléctrica, y de serlo, de autorizar o rechazar la misma. Por lo tanto, el referido planteamiento por LUMA y el Negociado no se atenderá en este recurso por no ser susceptible de adjudicación en esta etapa.

**B**

Ahora bien, nos corresponde determinar si el Negociado puede, al amparo de sus facultades, validar una cláusula que exime de responsabilidad civil a un concesionario privado de servicio público esencial, o si dicha concesión se trata de una prerrogativa exclusiva de la Asamblea Legislativa. De tratarse de este último escenario, la ausencia de delegación expresa invalidaría la concesión de

inmunidad por el Negociado por ser contraria al orden público y la estructura constitucional de Puerto Rico.

LUMA plantea que el mecanismo regulatorio de limitación de responsabilidad es la norma en Estados Unidos y en otras jurisdicciones, y su aprobación se delega a los reguladores de energía con poderes sobre fijación de tarifas. De esta forma, sostiene que los tribunales de Estados Unidos han determinado que las comisiones o agencias reguladoras de compañías de servicios públicos poseen autoridad implícita para otorgar relevos de responsabilidad. Por consiguiente, concluyó que las limitaciones de responsabilidad forman parte del régimen normativo aplicable a los servicios públicos y su legalidad e interpretación obedece a tal normativa y no al derecho contractual.

Previo a entrar en el análisis pertinente, es importante aclarar que, distinto a la práctica en Puerto Rico, en los Estados Unidos el concepto de tarifa en los servicios públicos comprende un conjunto de reglas, condiciones y cargos que rigen la relación entre la empresa de servicio y sus clientes. 64 Am. Jur. 2d Public Utilities sec. 51 (2025). Además, en el derecho de Estados Unidos, regido por el *common law*, las empresas de servicio público reguladas tienen la obligación de presentar tarifas ante la comisión de servicio público correspondiente, en las que consignan tanto los precios del servicio como los términos y condiciones aplicables a la relación con sus abonados.

Íd. De este modo, conforme al *filed rate doctrine*, una vez dichas tarifas son presentadas y aprobadas por la agencia administrativa competente bajo el marco legal aplicable, estas no constituyen meramente un contrato entre las partes, sino que adquieren la fuerza y efecto de ley. Íd. Véase, también, *Colich & Sons v. Pacific Bell,* 198 Cal.App.3d 1225, 1232 (1988). De esta forma, en Estados Unidos, la función de fijar tarifas es una cuasilegislativa ejercida por un organismo administrativo **facultado por la legislatura con esa autoridad**. 64 Am. Jur. 2d Public Utilities sec. 58 (2025).

Cabe destacar que esta doctrina no se limita únicamente a controversias sobre el precio del servicio, sino que también cubre aspectos no tarifarios, como los términos y condiciones del suministro, dentro de los cuales se incluyen las cláusulas de limitación de responsabilidad. Íd. (citando a *Zurich American Insurance Company v. Southern Connecticut Gas Company,* 442 F.Supp.3d 510, 514 (2020)). Así, las cláusulas de limitación de responsabilidad tienen el propósito de restringir la responsabilidad de la empresa de servicio frente a reclamaciones de consumidores por interrupciones, fallas o irregularidades en la prestación del servicio. Véase John L. Rudy, *Limitation of Liability Clauses in Public Utility*

*Tariffs: Is the Rationale for State-Sponsored Indemnity Still Valid?*, 52 Buff. L. Rev. 1379 (2004).[7]

## C

Cónsono con lo anterior, LUMA arguye que, al igual que en los Estados Unidos, la Asamblea Legislativa delegó al NEPR, mediante la *Ley de Transformación y ALIVIO Energético*, *supra*, poderes sobre limitación de tarifas que incluyen el mecanismo de limitación de responsabilidad. Ello pues, según adujo, es el Negociado quien tiene la facultad en ley de aprobar tarifas energéticas propuestas por la AEE y demás compañías de energía en Puerto Rico. Además, sostuvo que el NEPR tiene la autoridad de fiscalizar todo tipo de operación, proceso y mandato relacionado con la eficiencia del sector energético, para lo cual, sigue modelos de estructura de países europeos y latinoamericanos y de las comisiones reguladoras de servicios públicos establecidas en diferentes estados de Estados Unidos. En específico, LUMA cita el Art. 6.3(rr) de la referida ley para destacar que las disposiciones de este estatuto deben ser interpretadas liberalmente, y que la enumeración de los poderes y autoridades del NEPR no se interpretarán como que excluyen o impiden cualquier otro

---

[7] Históricamente, las cláusulas de limitación de responsabilidad, conocidas también como *indemnity by tariff*, surgieron en los Estados Unidos como mecanismo para proteger a las empresas eléctricas de reclamaciones por negligencia ordinaria. Estas cláusulas se incorporaron en las tarifas reguladas por las comisiones de servicios públicos, que controlaban tanto las tarifas como las condiciones del servicio. Su justificación principal era evitar litigios costosos y mantener las tarifas bajas para los consumidores dentro de un sistema de control estatal. Rudy, *supra*, págs. 1393-1395.

poder o autoridad de otra manera conferida. 22 LPRA sec. 1054b.

DACo, por su parte, expresó que esta ley no le otorga al Negociado la autoridad para conferir inmunidad a entidades privadas, sino que su función regulatoria está limitada a asegurar el cumplimiento con la política pública energética y proteger los intereses de los consumidores del servicio de energía eléctrica mediante la fiscalización de la operación del sistema eléctrico. Adelantamos que coincidimos con el DACo respecto a que la *Ley de Transformación y ALIVIO Energético*, *supra*, no tiene ninguna expresión implícita o expresa del legislador en la cual se le haya delegado al NEPR la facultad de otorgar inmunidad a favor de la AEE o de LUMA. Veamos.

Tal y como hemos discutido anteriormente, en nuestro ordenamiento jurídico existen diferentes supuestos en los cuales se ha reconocido la inmunidad por razones de orden público o política pública. Véase *Consejo Cond. Plaza del Mar v. Jetter, supra*, en la pág. 656. Sin embargo, hemos sido en extremo cautelosos al insistir que, salvo disposición expresa que conceda la inmunidad a un grupo o sector de la población, debemos entender que éstos se encuentran sujetos a la imposición de responsabilidad civil extracontractual por sus actos u omisiones negligentes o culposos. Íd., en la pág. 657. De este modo, por ejemplo, se creó por la vía estatutaria: una exención a la responsabilidad por daños y perjuicios a los patronos bajo

el Fondo del Seguro del Estado;[8] una inmunidad a ciertos profesionales e instituciones de la salud contra una acción civil de daños por culpa o negligencia por impericia profesional;[9] entre otros supuestos.

**D**

En atención al derecho antes expuesto, analizamos las disposiciones pertinentes de la *Ley de Transformación y ALIVIO Energético*, *supra*, con el fin de identificar si el legislador confirió expresamente una inmunidad a las compañías de servicio eléctrico ante acciones de responsabilidad civil o, si le otorgó al NEPR la facultad de concederla. El Art. 6.3 del mencionado estatuto provee un extenso listado de los poderes y deberes del Negociado, entre los cuales se encuentran: aprobar tarifas justas y razonables; fiscalizar el cumplimiento de la política pública energética; emitir reglamentos; ordenar investigaciones y audiencias; imponer multas por incumplimiento; y garantizar la protección de los consumidores. 22 LPRA sec. 1054b. Un examen minucioso del listado de poderes y deberes del NEPR nos permite concluir que, en efecto, **no hay ninguna disposición que expresamente delegue facultad al NEPR para otorgar inmunidad o limitar**

---

[8] Véase el Art. 18 de la Ley Núm. 45 de 18 de abril de 1935, según enmendada, Ley del Sistema de Compensaciones por Accidentes del Trabajo, 11 LPRA sec. 21, en el cual establece la inmunidad patronal y la exclusividad del remedio contra cualquier reclamación, siempre y cuando dicha reclamación provenga de una lesión, enfermedad o muerte cubierta por dicha ley.

[9] Véase Art. 7 de la Ley Núm. 136 de 27 de julio de 2006, según enmendada, conocida como la Ley de los Centros Médicos Académicos Regionales de Puerto Rico, 24 LPRA sec. 10035.

**la responsabilidad de compañías de servicio eléctrico en el ámbito de la responsabilidad civil.**

Destacamos que el inciso (rr) del Art. 6.3 de la citada ley dispone que "las acciones, reglamentaciones y determinaciones del NEPR se guiarán por las leyes aplicables, por el interés público y por el interés de proteger los derechos de los clientes o consumidores". 22 LPRA sec. 1054b. Además, el mismo inciso establece que "[l]as disposiciones de esta Ley serán interpretadas liberalmente para poder alcanzar sus propósitos y dondequiera que algún poder específico o autoridad sea dada al NEPR, la enumeración no se interpretará como que excluye o impide cualquier otro poder o autoridad de otra manera conferida a esta". Íd. Asimismo, el referido inciso aclara que el NEPR "tendrá, además de los poderes enumerados en esta Ley, todos los poderes adicionales implícitos e incidentales que sean apropiados y necesarios para efectuar y llevar a cabo, desempeñar y ejercitar todos los poderes antes mencionados y para alcanzar los propósitos de esta Ley". Íd.

En cuanto a esto último, **aun cuando este inciso reconoce poderes implícitos e incidentales al Negociado, precisamos que estos deben interpretarse a la luz de la ley y del interés público, lo cual incluye la protección de los derechos de los consumidores y no su restricción.** El enunciado sobre la interpretación liberal de las disposiciones de la ley, si bien busca ampliar la facultad

regulatoria del NEPR, no es suficiente para concluir que se le han conferido poderes para alterar el régimen de responsabilidad civil que rige nuestro ordenamiento jurídico. Reiteramos que una interpretación expansiva de las facultades del NEPR no puede sobrepasar los límites impuestos por principios fundamentales del derecho civil. Por lo tanto, **concluimos que no hay delegación alguna en la *Ley de Transformación y ALIVIO Energético*, *supra*, que confiera facultades al NEPR para otorgar una inmunidad o limitar la responsabilidad civil de las empresas de energía**. Una delegación de tal magnitud evidentemente requiere una manifestación legislativa clara e inequívoca, y ello no es el caso en el referido estatuto.

Una corporación pública carece de poder para alterar el régimen de responsabilidad extracontractual del ordenamiento civil. Una resolución administrativa no puede crear de facto inmunidades que la ley no confiere ni autoriza a conferir. El cliente no es parte del contrato entre la corporación y el contratista, y el ordenamiento reconoce la acción directa contra quien causa el daño.

Ahora bien, no debe confundirse la cláusula aquí examinada con una *hold harmless clause* típica. Una cláusula de indemnización o *hold harmless* es un acuerdo por el cual una parte asume contractualmente la obligación de defender, indemnizar o mantener indemne a la otra frente a reclamaciones de terceros surgidas en la ejecución del contrato. Su efecto opera exclusivamente entre las partes.

Es decir, no suprime la acción directa del tercero perjudicado ni crea una exención sustantiva de responsabilidad civil. En cambio, una cláusula como la avalada por el NEPR, que exonera completamente de responsabilidad extracontractual tanto a PREPA como a LUMA, no es una mera asignación de riesgo, sino un intento de establecer por contrato una inmunidad cuasi legislativa. Reiteramos que esta prerrogativa corresponde exclusivamente a la Asamblea Legislativa. Por ello, una resolución administrativa que extingue la habilidad de terceros de invocar una causa de acción reconocida por ley viola la doctrina constitucional de separación de poderes.

La separación de poderes "es la salvaguarda que nuestra Constitución consagra para preservar las libertades del Pueblo y un sistema democrático de Gobierno". *Domínguez Castro et al. v. ELA I*, 178 DPR 1, 91 (2010). Como bien indicáramos, "la separación de poderes conlleva un sistema de contrapesos y de sabia utilización del poder discrecional de cada rama con el propósito de asegurar un 'equilibrio dinámico' que asegure el funcionamiento efectivo del sistema republicano de gobierno". *Pueblo v. González Malavé*, *supra*, en las págs. 599-600. **En este caso, resolvemos que, la *Ley de Transformación y ALIVIO Energético*, *supra*, carece de disposición expresa que autorice al NEPR a otorgar inmunidad o alterar el régimen de responsabilidad civil, por lo que su actuación carece de base legal y resulta *nula ab initio*.**

Al crear un régimen de inmunidad por vía de la Resolución del NEPR, el Negociado invadió la esfera exclusiva del poder legislativo, pues solo la Asamblea Legislativa tiene la prerrogativa constitucional de definir los supuestos en que procede una exoneración de responsabilidad. **Reiteramos que la facultad de determinar cuándo y bajo qué condiciones una entidad privada puede gozar de inmunidad responde a un juicio de política pública que solo el legislador puede realizar, no una agencia mediante resolución administrativa.** Por consiguiente, el intento del NEPR de conferir inmunidad a LUMA constituye una violación directa al principio constitucional de separación de poderes.

**VII**

Por los fundamentos antes expuestos, resolvemos mediante *Sentencia Declaratoria* que la Sección 4.1(g) del OMA y la Resolución del NEPR son inconstitucionales por infrigir la doctrina de separación de poderes, sin menoscabar el resto del OMA, el cual permanece en vigor. Además, las reclamaciones instadas por los consumidores deberán ser atendidas conforme a los procedimientos establecidos.

A tenor con lo esbozado, reiteramos que la facultad de concederle inmunidad a una entidad privada responde a un juicio de política pública que solamente la Asamblea Legislativa puede realizar.

Se dictará Sentencia en conformidad.


Raúl A. Candelario López
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Departamento de Asuntos del Consumidor<br><br>Peticionario<br><br>v.<br><br>LUMA Energy, LLC.; LUMA Energy ServCo, LLC; Negociado de Energía de Puerto Rico; Autoridad de Energía Eléctrica<br><br>Recurridos | CT-2025-0003 |

**SENTENCIA**

En San Juan, Puerto Rico, a 1 de diciembre de 2025.

Por los fundamentos expuestos en la Opinión que antecede, los cuales se hacen formar parte de esta Sentencia, resolvemos mediante Sentencia Declaratoria que la Sección 4.1(g) del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (OMA) y el *Resolution and Order* emitido por el Negociado de Energía de Puerto Rico el 31 de mayo de 2021 son inconstitucionales por infrigir la doctrina de separación de poderes, sin menoscabar el resto del OMA, el cual permanece en vigor. Además, las reclamaciones instadas por los consumidores deberán ser atendidas conforme a los procedimientos establecidos.

A tenor con lo esbozado, reiteramos que la facultad de concederle inmunidad a una entidad privada responde a un juicio de política pública que solamente la Asamblea Legislativa puede realizar.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez emitió una *Opinión de conformidad.* La Jueza Presidenta Oronoz Rodríguez concurre sin opinión escrita. El Juez Asociado señor Colón Pérez emitió una *Opinión concurrente* a la cual se unió la Jueza Presidenta Oronoz Rodríguez.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Departamento de Asuntos del Consumidor<br><br>Peticionario<br><br>v.<br><br>LUMA Energy, LLC; LUMA Energy ServCo, LLC; Negociado de Energía de Puerto Rico; Autoridad de Energía Eléctrica<br><br>Recurridos | CT-2025-0003 | Certificación |

Opinión de conformidad emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 1 de diciembre de 2025.

Las fluctuaciones en el voltaje, los relevos de carga y otras acciones y omisiones han provocado que miles de consumidores toquen a las puertas de las oficinas comerciales de LUMA y otros foros para reclamar multiplicidad de daños. Sin embargo, **se han topado con la barrera del relevo de responsabilidad civil extracontractual invocado por LUMA.** Nos encontramos ante un relevo de responsabilidad de tal envergadura que impide a los consumidores reclamar los daños provocados por un servicio eléctrico interrumpido, irregular o deficiente, como resultado de fuerza mayor, deterioro preexistente del sistema, actos de sabotaje o <u>negligencia ordinaria</u>.

Estoy conforme con que este Tribunal **no se haya relevado de su responsabilidad y procediera a declararlo nulo**. Me explico.

Principalmente, son dos los asuntos apremiantes que a este Tribunal le corresponde resolver: (1) si el Departamento de Asuntos del Consumidor (DACo o parte peticionaria) tiene legitimación activa para impugnar la constitucionalidad de un relevo de responsabilidad civil extracontractual concedido por el Negociado de Energía de Puerto Rico (NEPR o Negociado) en los términos del servicio eléctrico a la Autoridad de Energía Eléctrica (AEE) y a LUMA Energy, LLC y LUMA Energy ServCo, LLC (en conjunto, LUMA), incluido en el Libro de Tarifas de la AEE, por actos negligentes en la operación y mantenimiento del sistema de transmisión y distribución de la energía que causen daños a los consumidores; y (2) si ese relevo de responsabilidad civil extracontractual es nulo.

LUMA rechaza que el DACo tenga legitimación y que el relevo de responsabilidad civil extracontractual sea inválido. A esa posición, se une el NEPR. El DACo, por su parte, responde en la afirmativa y, a su favor, intervienen el Senado y la Cámara de Representantes de Puerto Rico y el Instituto de Competitividad y Sostenibilidad Económica (ICSE).

En vista del análisis subsiguiente, también respondo afirmativamente a ambas controversias. En primer orden, el

DACo tiene legitimación activa para solicitar la declaración de invalidez del relevo de responsabilidad concedido por el NEPR en una *Resolution and order* del 31 de mayo de 2021 en el caso NEPR-MI-2021-0007. En segundo orden, el relevo es nulo. Veamos.

I

Los hechos procesales de este caso están reseñados en la Opinión de este Tribunal y, por ello, omito reproducirlos en esta *Opinión de conformidad.*

II

A.

La legitimación activa es una de las doctrinas de autolimitación judicial que se ha desarrollado en virtud del principio de la justiciabilidad. Mediante su creación por vía jurisprudencial, se ha procurado que un pleito se tramite a nombre de la persona que por ley tenga el derecho que se reclama. En el pasado he subrayado el origen judicial de esta norma y, por ello, he recalcado que su aplicación responde a la prudencia en la intervención en controversias particulares. En ese respecto, también he resaltado que nuestra Constitución carece del requisito de caso o controversia y he exhortado a tomar en cuenta las diferencias textuales, estructurales, históricas y funcionales de nuestro ordenamiento jurídico frente al federal. Véase *B. Billboard BG v. Out of Home Media*, 213 DPR 1076, 1082 (2024) (Voto particular disidente del Juez Asociado señor Estrella Martínez); *Amadeo Ocasio et al. v. Gobernador et al.,* 211

DPR 278, 320 (2023) (Opinión de conformidad del Juez Asociado señor Estrella Martínez).

Recordemos, entonces, que existen dos (2) vertientes de la legitimación activa. Por un lado, la tradicional u ordinaria, aquella que requiere que un demandante demuestre que: (1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal razonable entre la acción que se ejercita y el daño alegado; y (4) la causa de acción surge al palio de la Constitución o de alguna ley. *Fund. Surfrider y otros v. A.R.Pe.,* 178 DPR 563, 572 (2010); *Hernández Torres v. Gobernador,* 129 DPR 824, 836 (1992); *Hernández Agosto v. Romero Barceló*, 112 DPR 407, 414 (1982).

Por el otro lado, la legitimación estatutaria es aquella que se le concede a una persona o parte por autorización de una ley, independientemente de si sufrió o no un daño claro, palpable o particularizado. *Com. de la Mujer v. Srio. de Justicia,* 109 DPR 715, 723-724 (1980); *Salas Soler v. Srio. de Agricultura*, 102 DPR 716, 720 (1974).

Como norma general, hemos pautado que, en ausencia de un estatuto que expresamente confiera legitimación activa a ciertas personas, corresponde acudir a los elementos de la legitimación activa ordinaria. *Hernández Torres v. Gobernador, supra*, pág. 835.

A la luz de lo anterior, un análisis sosegado del Derecho aplicable arroja que el DACo tiene legitimación estatutaria en virtud de su ley habilitadora. Veamos.

El Art. 6 de la Ley Núm. 5 de 23 de abril de 1973, según enmendada, también conocida como la Ley Orgánica del Departamento de Asuntos del Consumidor (Ley Orgánica del DACo), 3 LPRA sec. 341e, delineó los deberes y facultades que la Secretaria del DACo tendrá "en adición a los poderes y facultades transferidos" por el resto del estatuto. En lo pertinente, el inciso (e) del citado artículo faculta a la Secretaria a "[r]epresentar al público consumidor ante cualquier entidad privada u organismo público en cualquier asunto que afecte o pueda afectar los intereses del consumidor". Íd. Similarmente, el inciso (f) dispone el poder de:

> [c]omparecer por y en representación de los consumidores ante cualquier tribunal, junta o comisión, organismo administrativo, departamento, oficina o agencia del Estado Libre Asociado de Puerto Rico y/o del gobierno de los Estados Unidos en cualquier vista, procedimiento o asunto que afecte o pueda afectar los intereses del consumidor en general, de grupos de consumidores o de cualquier consumidor en particular. Íd.

De esta forma, diáfanamente y sin ambages, el Art. 6 de la Ley Orgánica del DACo, *supra*, le concede legitimación estatutaria al DACo para reclamar en nombre de los consumidores en cualquier procedimiento ante cualquier foro que afecte o pueda afectar los intereses de estos.

En oposición, LUMA plantea que la legitimación estatutaria para reclamar en representación del consumidor-cliente del sistema eléctrico- la ostenta exclusivamente la Oficina Independiente de Asuntos del Consumidor (OIPC). En la alternativa, argumenta que, aun si se reconociera lo

contrario, el DACo no probó la existencia de un daño claro, real y palpable, requisito mayormente vinculado con la legitimación activa tradicional. No le asiste la razón.

Como esbocé, el Art. 6 de la Ley Orgánica del DACo, *supra*, no limita el ámbito de acción del DACo en representación de los consumidores. Al contrario, el estatuto es amplio al concederle legitimación estatutaria a la agencia. Según mencioné anteriormente, esa facultad de representación alcanza cualquier procedimiento ante cualquier foro o asunto que afecte los intereses de tan solo un consumidor. Es decir, allí en donde tan solo un consumidor se vea o pueda verse afectado, el DACo podrá acudir en representación de sus intereses.

Visto de ese modo, no convencen los argumentos de LUMA en cuanto a que la OIPC ostenta exclusivamente la legitimación para reclamar lo que DACo postula. A diferencia del DACo, la OIPC fue creada por el Art. 6.40 de la Ley Núm. 57-2014, según enmendada, también conocida como la Ley de Transformación y ALIVIO Energético (Ley Núm. 57-2014), 22 LPRA sec. 1054nn, para asistir, representar y defender a los clientes del servicio bajo la jurisdicción de la Junta Reglamentadora de Servicio Público de Puerto Rico. Según la Exposición de motivos de esa ley, la OIPC tiene la función de representar y defender los intereses de los consumidores del servicio energético ante la AEE y la Comisión de Energía –ahora NEPR–, incluyendo disputas sobre facturas, así como

el deber de coordinar la participación ciudadana activa en el proceso interno de revisión de tarifas de la AEE y el Negociado.

En lo pertinente, el Art. 6.42 de la Ley Núm. 57-2014, 22 LPRA sec. 1054qq, enumera el poder de representación de la OIPC ante los tribunales de Puerto Rico y los Estados Unidos. En específico, establece que la OIPC podrá:

> (i) Participar o comparecer como parte peticionaria o como parte interventora en cualquier acción ante el Tribunal General de Justicia o ante los tribunales de la jurisdicción federal, relacionada con tarifas, facturas, política pública o a cualquier otro asunto que pueda afectar a los clientes de servicio eléctrico, telecomunicaciones y transporte;

De esa forma, dispone de una facultad de representación similar a la del DACo, limitada a los consumidores del servicio eléctrico, pero no excluyente de la legitimación amplia que la Ley Orgánica del DACo le concede al DACo para representar a cualquier consumidor. Nada en la Ley Núm. 57-2014, *supra*, conduce a concluir que la facultad concedida a la OIPC y la legitimación conferida al DACo son mutuamente excluyentes. La mera existencia de una ley que otorga una facultad de representación más general, como la Ley Orgánica del DACo, *supra*, frente a un estatuto que permite una de carácter más específico, como la Ley Núm. 57-2014, *supra*, no activa automáticamente la doctrina de que una disposición jurídica especial prevalece sobre una general. Para que ello ocurra, se requiere que exista un choque o una contradicción entre las normas involucradas. *Guardiola Álvarez v. Depto.*

*de la Familia,* 175 DPR 668, 678 (2009); *A.I.I.Co. v. San Miguel*, 161 DPR 589, 597-598 (2004); *Córdova & Simonpietri v. Crown American,* 112 DPR 797, 800 (1982); *Ex parte Ramos,* 53 DPR 374 (1938); J.M. Farinacci Fernós, *Hermenéutica puertorriqueña. Cánones de interpretación jurídica*, 1ª ed., San Juan, Ed. Interjuris, 2019, pág. 47.

Como vemos, este no es el caso de las dos (2) agencias concernidas en este tema. Por el contrario, en esta ocasión coexisten dos (2) concesiones de legitimación activa para reclamar en favor del consumidor. Y más, cuando, en virtud del interés público impulsado tanto por la Ley Orgánica del DACo, *supra*, como por la Ley Núm. 57-2014, *supra*, no existe espacio para una interpretación restrictiva del poder de representación que lo limite exclusivamente a la OIPC en los asuntos relacionados con los consumidores del servicio eléctrico.

A la luz de lo anterior, ante un estatuto que expresamente le confiere legitimación al DACo, tampoco hace falta acudir a los elementos tradicionales del daño de la legitimación activa ordinaria. *Hernández Torres v. Gobernador, supra*. Al contrario, una lectura de los incisos (e) y (f) del Art. 6 de la Ley Orgánica del DACo, *supra*, demuestra un estándar mínimo –que el consumidor en general, un grupo de consumidores o, incluso, un solo consumidor se afecte o se pueda ver afectado –para que el DACo pueda ejercer su facultad estatutaria de representación. Precisamente, el instar una reclamación en pro de los

consumidores para que se reconozca la invalidez de un relevo de responsabilidad, que le privaría del derecho a reclamar por los daños causados por la culpa o negligencia de un proveedor de servicio eléctrico, constituye un ejercicio legítimo de esa legitimación reconocida al DACo en su ley orgánica.

A tales efectos, al analizar el estatuto que le otorga legitimación activa al DACo, concluyo que no es requerido que los consumidores, ni la agencia en representación de estos, cumpla con probar un daño claro y palpable, como se requiere en la legitimación activa ordinaria.

Todavía más, la denegación de querellas por daños causados por la presunta negligencia de LUMA, en virtud de un relevo de responsabilidad inválido, representa un daño real y palpable que los consumidores ya han experimentado o un daño inminente que podrían sufrir. De este modo, el DACo tendría legitimación aun si se le exigiera cumplir con el requisito de daño, conforme al estándar propio de la legitimación activa tradicional.

Ahora bien, lo anterior no es óbice para autorizar la intervención de la OIPC en este pleito. Por el contrario, esa acción es cónsona con el reclamo principal de ambas entidades a favor de los consumidores. Sabido es que la intervención es un vehículo procesal de utilidad y uso común en los tribunales, el cual no es fuente de derechos sustantivos ni establece una causa de acción. *IG Builders et al. v. BBVAPR*, 185 DPR 307, 320 (2012). Mediante este

mecanismo, se permite que un tercero comparezca en una acción judicial previamente instada y presente una reclamación o una defensa, convirtiéndose en parte para esos fines. *Íd.*, págs. 320-321, citando a J.A. Cuevas Segarra, *Tratado de derecho procesal civil*, 2da ed., San Juan, Pubs. J.T.S., T. II, 2011, pág. 779. Su uso debe procurar un balance entre la economía procesal y la necesidad de que los casos concluyan dentro de un tiempo razonable. *Íd.*, pág. 321. Por todo ello, al evaluar una solicitud de intervención debe aplicarse un análisis pragmático. *Íd.* En específico, se debe considerar si existe un interés que amerite protección y si ese interés se vería afectado, como cuestión práctica, por la ausencia del interventor en el caso. *Íd.*, citando a *S.L.G. Ortiz-Alvarado v. Great American,* 182 DPR 48, 80 (2011); véase también *Chase Manhattan Bank v. Nesglo, Inc.*, 111 DPR 767, 770 (1981).

En este caso, tanto el DACo como la OIPC persiguen proteger a los consumidores y, por ello, ejercen válidamente facultades en defensa del interés público. Por tal razón, el interés del consumidor, el cual amerita protección, se ve aún más robustecido por la intervención de la OIPC.

B.

Además del cuestionamiento sobre la legitimación activa del DACo para presentar la acción de epígrafe, LUMA también argumenta que la Autoridad para las Alianzas Público Privadas (AAPP) es una parte indispensable cuya ausencia incide sobre nuestra jurisdicción para adjudicar la

controversia. A su juicio, la presencia de la AAPP es indispensable porque el DACo solicita la declaración de nulidad de una cláusula contractual del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (*O&M Agreement*), al que esa entidad compareció como parte administradora con funciones de supervisión. En ese sentido, planteó que esa entidad tiene un interés en el pleito que se vería afectado inmediatamente por una declaración de nulidad. Igualmente, resaltó que la declaración de nulidad del relevo de responsabilidad sería un cambio de ley regulatoria que, en virtud del *O&M Agreement*, podría constituir una modificación materialmente adversa a LUMA que, a su vez, se podría interpretar como un evento de incumplimiento que dé lugar a la terminación del contrato.

En cambio, para el DACo, la AAPP no es una parte indispensable porque, aunque firmó el *O&M Agreement*, ese contrato no está en controversia en el presente pleito y, además, esa entidad únicamente se obligó a presentar el relevo de responsabilidad al Negociado, siendo este último quien lo otorgó a LUMA. También, arguyó que, si algo, la AAPP podría ser considerada parte interesada, mas no indispensable. Por último, esbozó que la ausencia de la AAPP no impide la adjudicación válida de la controversia ni vicia el remedio declaratorio solicitado.

En nuestro ordenamiento, la Regla 16.1 de Procedimiento Civil, 32 LPRA Ap. V, dispone que "[l]as personas que tengan

un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas, según corresponda". La idea es que, sin una parte indispensable, no se puede proseguir porque, ante su ausencia, los asuntos litigiosos no se pueden adjudicar correctamente, pues sus derechos quedarían afectados. *López García v. López García,* 200 DPR 50, 63 (2018). De ordinario, para que aplique esta norma, la parte ausente debe tener un interés común en el pleito que sea real, inmediato y de tal magnitud que su presencia se torne en un requisito indispensable para impartir justicia completa entre las partes o impida la confección de un decreto sin afectarlo. Íd., citando a R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 6ta ed., San Juan, Ed. LexisNexis, 2017, Sec. 1202, pág. 166. Por eso, también hemos pautado que el interés necesario no puede tratarse de meras especulaciones o de un interés futuro. Íd., pág. 64.

Ahora bien, hemos rechazado aplicar una fórmula rígida para determinar la aplicación de esta norma. Por el contrario, su interpretación debe seguir un enfoque pragmático en el que se evalúe cada caso a la luz de las circunstancias particulares que se presenten. Íd. En esa vía, hemos destacado que se debe examinar el tiempo, el lugar, el modo, las alegaciones, la prueba, la clase de derechos, los intereses en conflicto, el resultado y la formalidad. Íd., págs. 64-65, citando a J.A. Cuevas Segarra,

*op.cit.*, pág. 695. En fin, lo esencial es descifrar "si el tribunal puede hacer justicia y conceder un remedio final y completo a las partes presentes sin afectar los intereses de la parte ausente". Íd., pág. 65.

En este contexto, cabe recordar que la razón de ser de la Regla 16.1 de Procedimiento Civil, *supra*, es proteger el debido proceso de ley de las personas ausentes, así como resguardar contra los efectos que implicaría una sentencia y evitar la multiplicidad de pleitos. Íd., págs. 65-66. Por tratarse de una violación del debido proceso de ley, la falta de parte indispensable es un fundamento para relevar los efectos de una sentencia y también está disponible como defensa afirmativa irrenunciable que puede presentarse en cualquier momento. Íd.

Por todo ello, no considero que la AAPP sea una parte indispensable que impida la atención de este recurso de certificación, especialmente cuando lo que se solicita es una sentencia declaratoria en virtud de la Regla 59.1 de Procedimiento Civil, *supra*. Contrario a lo esbozado por LUMA, este pleito versa sobre la declaración de nulidad de la concesión otorgada por el Negociado del relevo de responsabilidad civil, contenido en la *Resolution and order* del 31 de mayo de 2021 en el caso NEPR-MI-2021-0007. La Sección 4.1(g) del *O&M Agreement* concierne únicamente a la obligación de las partes contratantes –la AEE, la AAPP y LUMA– de someter cierto lenguaje de relevo de responsabilidad a la consideración del Negociado. Para

efectos prácticos, esa cláusula contractual no está en controversia. De la misma manera, tampoco está en controversia la posibilidad de modificación material que contempla el Artículo 14 del *O&M Agreement*. De este modo, sostengo que el DACo acumuló a las partes cuya presencia es indispensable por el interés que poseen en el litigio: la AEE, el NEPR y LUMA.

### III

### A.

El principio de la separación de poderes es una doctrina fundamental del sistema político en los Estados Unidos y en Puerto Rico. La Constitución de los Estados Unidos incorpora este principio de forma implícita. *Trump v. United States*, 603 US 593, 637-638 (2024); *Sheila Law LLC v. Consumer Financial Protection Bureau*, 591 US 197, 227 (2020). Mientras, la Constitución de Puerto Rico lo consagra expresamente. Art. 1, Sec. 2, Const. PR, LPRA, Tomo 1; *Dalmau Ramírez et al. v. ELA et al.,* 214 DPR 841, 855 (2024); *Senado v. Tribunal Supremo y otros*, 208 DPR 115, 135 (2021); *Clase A, B y C v. PRTC*, 183 DPR 666, 681 (2011); *Colón Cortés v. Pesquera*, 150 DPR 724, 754 (2000).

Al separarse los poderes, se busca principalmente proteger la libertad de los individuos frente a una peligrosa acumulación del poder en una sola persona o entidad. *Collins v. Yellen*, 594 US 220, 245 (2021); *Clase A, B y C v. PRTC*, *supra*. Asimismo, se persigue promover el más eficiente funcionamiento del sistema. *Clase A, B y C v. PRTC*, *supra*,

citando a *Nogueras v. Hernández Colón*, 127 DPR 405, 426-427 (1990). Esto último se logra especialmente al delinear los contornos de los poderes de las ramas del gobierno. Íd.; *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791, 878 (2014) (Opinión disidente del Juez Asociado señor Estrella Martínez).

En virtud de este principio, el poder político se divide en tres ramas -la legislativa, la ejecutiva y la judicial- con responsabilidades y ámbitos de acción definidos para garantizar la independencia de cada una. *Dalmau Ramírez et al. v. ELA et al., supra*, págs. 855-856. En esa distribución del poder, también se instituye un régimen de pesos y contrapesos (*checks and balances*) para evitar que las acciones de una invadan o usurpen el campo de acción de otra. Íd., pág. 856; *AAR, Ex parte*, 187 DPR 835, 852-853 (2013); *Colón Cortés v. Pesquera, supra*, pág. 752; *Sinking Fund Cases*, 99 US 700, 718 (1878). Así, esta separación se violenta cuando una rama invade el territorio de otra, independientemente de si la rama afectada está de acuerdo o no con la intromisión. *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,* 561 US 477, 497 (2010); *New York v. U.S.,* 505 US 144, 182 (1992).

De esta forma, la separación no es total, pues existe cierta interdependencia entre las tres ramas porque, precisamente, el propósito de la separación de poderes es generar un equilibrio dinámico entre estos poderes de igual

rango. *Nieves Huertas et al. v. ELA I,* 189 DPR 611, 619 (2013); *Misión Ind. P.R. v. J.P.*, 146 DPR 64, 89 (1998). Cada rama desempeña una función propia, soberana e independiente, pero para hacerlo debe interrelacionarse y colaborar con las otras, mientras mantiene íntegra su autoridad. *Domínguez Castro et al. v. E.L.A. I*, 178 DPR 1, 91 (2010). Y es que, a grandes rasgos, la ley es creada por el poder legislativo, cumplida por el poder ejecutivo e interpretada por el poder judicial. *Patchak v. Zinke*, 583 US 244, 249 (2018), citando a *Massachusetts v. Mellon*, 262 US 447, 488 (1923); *Banco Popular, Liquidador v. Corte*, 63 DPR 66, 70 (1944). No obstante, dentro de esa distribución también existen múltiples normas para delimitar el campo de acción de cada rama.

A nivel del más alto foro federal, al analizar la separación de poderes se han desarrollado dos (2) principios: (1) la doctrina de la delegación o no delegación (*nondelegation doctrine*) y (2) la doctrina de las cuestiones principales (*major questions doctrine*).

En primer orden, el principio de la delegación impide que el Congreso descargue sus poderes legislativos o su capacidad de hacer las leyes en otra rama o entidad. *Loving v. United States*, 517 US 748, 758 (1996). Sin embargo, ello no implica que el Congreso no pueda delegar cierta autoridad para ejecutar las leyes en conformidad con el estatuto. Íd.; *Field v. Clark*, 143 US 649, 693-694 (1892). En ese sentido,

se ha requerido que, para que una delegación del poder legislativo sea válida, el Congreso plasme, mediante ley, un principio inteligible (*intelligible principle*) para obligar a la entidad autorizada en la ejecución del poder que se le delegó. *Gundy v. United States*, 588 US 128, 135 (2019); *Mistretta v. United States*, 488 US 361, 372 (1989), citando a *J.W. Hampton, Jr., & Co. v. U.S.*, 276 US 394, 409 (1928). Esto es, que se incluya una política general a seguir, así como límites a la autoridad. Íd., págs. 145-146.

En segundo orden, la doctrina de cuestiones principales es empleada cuando se presentan casos extraordinarios en los que una agencia reclama tener una autoridad de tal historia y amplitud, o de vasta importancia económica y política, que surge duda de si el poder legislativo tuvo la intención de conferirla. *West Virginia v. Environmental Protection Agency*, 597 US 697, 721 (2022), citando a *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 US 120, 159-160 (2000). En estos casos extraordinarios, el más alto foro federal ha reiterado que la separación de poderes y el entendimiento práctico de la intención legislativa impiden descifrar que existe una presunta delegación en un texto estatutario ambiguo. Íd., pág. 723. Por eso, aplica un escrutinio intensificado (*heightened scrutiny*). 3 *Rich, Modern Constitutional Law* Sec. 38:6 (Supl. 2025). En tales situaciones, se requiere más que una base meramente plausible que sirva para concluir que una acción de la agencia es necesaria; es imperativo que se provea una

autorización clara del Congreso para ejercer el poder que se alega tener. *West Virginia v. Environmental Protection Agency*, *supra*, pág. 721.

B.

Mientras tanto, en Puerto Rico también hemos analizado en extenso la separación de poderes.

A grandes rasgos, hemos rechazado adoptar una noción rígida de la doctrina de separación de poderes y, en su lugar, hemos optado por un criterio flexible y pragmático. *Misión Ind. P.R. v. J.P.*, *supra*; *Banco Popular, Liquidador v. Corte*, *supra*. También, hemos hecho eco de la doctrina de la delegación de poderes según su acepción federal. *Sánchez et al. v. Depto. de Vivienda et al.*, 184 DPR 95, 119-120 y 122 (2011). Así, la Asamblea Legislativa no puede delegar poderes arbitrarios e ilimitados a los organismos administrativos, pues siempre tiene que incluir en la ley normas suficientes y adecuadas que sirvan de guía y limiten el uso de la facultad delegada, independientemente sea de promulgación de reglamentos o de resolver controversias según hechos concretos. *López v. Junta de Planificación*, 80 DPR 646, 661 (1958). Asimismo, para adjudicar controversias que requieren un pronunciamiento sobre la aplicación de la separación de poderes, nos corresponde: (1) dilucidar si, en la operación real del sistema y en el contexto histórico específico, el poder delegado tiende a desembocar en una concentración de poder indebida en una de las ramas o en una disminución indeseable de la independencia incompatible con

el ordenamiento político de nuestra Constitución; (2) distinguir entre las facultades que integran la entraña misma del sistema y aquellos poderes trasladables por razones de peso; y (3) delimitar los contornos de los poderes públicos para evitar la concentración indebida de poderes y promover el más eficiente funcionamiento del sistema. *Nogueras v. Hernández Colón*, *supra*. (Citas omitidas).

Para las agencias del Poder Ejecutivo, la ley, especialmente la habilitadora, es su fuente de poder. *Raimundi v. Productora*, 162 DPR 215, 225 (2004). De ahí que una agencia administrativa no pueda asumir jurisdicción sobre una situación cuando no está autorizada por ley. Íd. Tampoco hay espacio para sustituir la ley por la necesidad, la utilidad o la conveniencia. Íd. Por ello, ante dudas sobre la existencia de un poder reclamado, debemos resolver en contra de su ejercicio. Íd. Esto, pues, las agencias administrativas "solo tienen los poderes *otorgados expresamente* por su ley habilitadora y aquellos que sean *indispensables* para llevar a cabo los [poderes] conferidos". (Bastardillas en el original). Íd., pág. 224.

De igual manera, la delegación de un poder a las agencias administrativas por parte de la Asamblea Legislativa será válida cuando se establezcan normas adecuadas o un principio inteligible que encauce las determinaciones de esa entidad. *Sánchez et al. v. Depto. de Vivienda et al.*, *supra*, pág. 122. Por eso, nuestro dictamen al respecto dependerá de un análisis caso a caso en el que

se evalúe la delegación conferida y los criterios que fijó la Asamblea Legislativa. Íd.

Ahora bien, en *Col. Médicos et als. v. Com. Seguros et al.,* 201 DPR 362 (2018), fuimos más exigentes en cuanto a la delegación de poderes a las agencias administrativas. Véase también J.M. Farinacci, *Divergencias entre la doctrina federal y puertorriqueña en el derecho administrativo*, 92 Rev. Jur. UPR 187, 203-204 (2023). En esa ocasión, reiteramos que las agencias administrativas solamente pueden ejercer los poderes que la ley habilitadora expresamente les ha otorgado y que sean indispensables para llevar a cabo su encomienda primordial. *Col. Médicos et als. v. Com. Seguros et al., supra*, pág. 372. Por eso, una agencia no puede asumir jurisdicción sobre una actividad, materia o conducta cuando no está claramente autorizada por ley. Íd.; *Ayala Hernández v. Consejo Titulares*, 190 DPR 547 (2014). Además, las agencias deben arribar a sus conclusiones sin apartarse de la ley habilitadora, incluso cuando persigan un presunto propósito legítimo. Íd. Toda actuación que no obedezca el poder conferido mediante legislación es *ultra vires* y, por lo tanto, nula. Íd. A la misma vez, pautamos que los criterios amplios y generales que servirán de guía para las agencias podrán surgir del historial legislativo. Íd., págs. 372-373. Cónsono con ello, hemos matizado que las leyes habilitadoras deben ser interpretadas de manera consistente con la intención legislativa, la política pública y el interés social que la inspira. Íd., pág. 373.

## C.

Ahora bien, no podemos desentender este asunto del Derecho Administrativo respecto al análisis del campo de acción de las agencias administrativas.

Por virtud jurisprudencial, los tribunales estamos llamados a otorgarle una amplia deferencia a las decisiones de las agencias administrativas, dada la experiencia y pericia que estas poseen para atender los asuntos bajo su tutela. *Vázquez et al. v. DACo*, 2025 TSPR 56, 216 DPR ___ (2025); *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021). Sin embargo, esta deferencia no es absoluta, pues no "podemos imprimirle un sello de corrección, so pretexto de deferencia, a las determinaciones o interpretaciones administrativas irrazonables, ilegales o contrarias de derecho". *Super Asphalt v. AFI y otro*, *supra*.

Esto, a su vez, complementa la Sec. 4.5 de la Ley Núm. 38-2017, según enmendada, también conocida como la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, 3 LPRA sec. 9675m, en cuanto establece que los tribunales sostendrán las determinaciones de hechos de las agencias si se basan en evidencia sustancial, mientras que las conclusiones de derecho serán revisables en todos sus aspectos.

A la luz de todo ello, la referida deferencia debe ceder cuando una agencia: (1) emitió una determinación sin base en evidencia sustancial; (2) erró al aplicar una ley o un reglamento; (3) actuó de forma arbitraria, irrazonable o

ilegal; (4) tomó una determinación carente de base racional;
y (5) actuó de manera que lesionó derechos constitucionales
fundamentales. *Super Asphalt v. AFI y otro*, *supra*, citando
a *Torres Rivera v. Policía de PR*, 196 DPR 606, 628 (2016).

Entretanto, recientemente, en *Vázquez et al. v. DACo*,
*supra*, abordamos la decisión del Tribunal Supremo federal en
*Loper Bright Enterprises v. Raimondo,* 603 US 369 (2024), y
decidimos que "tal y como resolvió el máximo foro federal,
los tribunales deben ejercer un juicio independiente al
decidir si una agencia ha actuado dentro del marco de sus
facultades estatutarias". *Vázquez et al. v. DACo*, *supra*. Al
respecto, expresamos:

> Hoy hacemos eco a las palabras del foro
> federal y concluimos que la interpretación de la
> ley es una tarea que corresponde inherentemente a
> los tribunales. Así, enfatizamos la necesidad de
> que los foros judiciales, en el ejercicio de su
> función revisora, actúen con el rigor que
> prescribe la LPAU, *supra*. Como corolario, al
> enfrentarse a un recurso de revisión judicial
> proveniente de una agencia administrativa, será el
> deber de los tribunales revisar las conclusiones
> de derecho en todos sus aspectos. No guiados por
> la deferencia automática […] sino que por los
> mecanismos interpretativos propios del Poder
> Judicial. Íd.

En esa ocasión, reconocí la utilidad analógica de la
doctrina federal establecida en *Loper Bright Enterprises v.
Raimondo* para evitar que los tribunales incurramos en una
deferencia excesiva y desproporcional en áreas que las
agencias no tienen un conocimiento especializado. Íd.
(Opinión de conformidad del Juez Asociado señor Estrella
Martínez). Asimismo, rechacé la adopción de una postura de

deferencia autómata y a ciegas hacia una determinación de una agencia. Íd.

En esencia, el Tribunal Supremo federal en *Loper Bright Enterprises v. Raimondo*, *supra*, pautó que los tribunales no tienen que brindar deferencia a la interpretación de una ley que realice una agencia administrativa simplemente porque el estatuto es ambiguo. De esa forma, quedó revocada la norma de dos (2) pasos de *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 US 837 (1984), la cual requería que los tribunales otorgaran deferencia a las interpretaciones permisibles de las agencias, incluso cuando el tribunal entendiera el estatuto de forma distinta. *Loper Bright Enterprises v. Raimondo*, *supra*, pág. 378.

Según la norma revocada, primero, el tribunal debía auscultar si el Congreso se había expresado directamente sobre la controversia específica en cuestión. Íd., pág. 379. Segundo, si la intención legislativa no estaba clara y, por ende, el estatuto guardaba silencio o era ambiguo en cuanto al asunto, entonces le correspondía al tribunal brindarle deferencia a la interpretación de la agencia cuando estuviese basada en una lectura permisible del estatuto. Íd., págs. 379-380.

Tras *Loper Bright Enterprises v. Raimondo*, los tribunales deben ejercer un juicio independiente para descifrar si una agencia actuó dentro de la autoridad estatutaria. Íd., pág. 412. Según delineó el Tribunal Supremo federal, esa tarea puede ser informada por el juicio

del Poder Ejecutivo. Íd., págs. 412-413. Igualmente, cuando una ley delegue la autoridad a una agencia en conformidad con los límites constitucionales, los tribunales deberán respetarla y asegurarse de que la agencia actúe dentro de ella. Íd., pág. 413.

Ello no significa que las impresiones de las agencias deben descartarse de plano. Al decidirse *Loper Bright Enterprises v. Raimondo*, también se citó favorablemente a *Skidmore v. Swift & Co.,* 323 US 134 (1944). En aquella ocasión, el más alto foro federal consideró que las determinaciones, interpretaciones y opiniones de una agencia representan un conjunto de experiencias y criterios fundamentados a los cuales los tribunales y los litigantes pueden acudir como guía. *Skidmore v. Swift & Co., supra*, pág. 140. Para definir cuánto peso otorgarles a esos criterios agenciales, pautó lo siguiente:

> The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control. Íd.

### D.

Como bien sugiere la jurisprudencia citada, cuando estamos ante una agencia administrativa que afirma poseer un determinado poder, nos corresponde examinar los estatutos aplicables a la delegación reclamada.

En este caso, son dos (2) las leyes más importantes para la evaluación del poder delegado o no delegado al NEPR.

La primera, la Ley Núm. 57-2014, *supra*, creó el Negociado y delimitó sus poderes, deberes y jurisdicción. La segunda, la Ley Núm. 120-2018, según enmendada, también conocida como la Ley para Transformar el Sistema Eléctrico de Puerto Rico (Ley Núm. 120-2018), 22 LPRA sec. 1111 *et seq.*, edificó el marco legal necesario para la privatización del sistema de transmisión y distribución de energía, el cual previamente estaba en manos de la AEE.

En primer orden, y en lo pertinente, el Art. 6.3 de la Ley Núm. 57-2014, 22 LPRA sec. 1054b, instituye los poderes y deberes del NEPR, entre los cuales se encuentran los siguientes:

(a) Fiscalizar y asegurar la cabal ejecución e implementación de la política pública sobre el servicio eléctrico en Puerto Rico;

(b) Establecer mediante reglamento las normas de política pública en relación con las compañías de servicio eléctrico, así como toda transacción, acción u omisión que incida sobre la red eléctrica y la infraestructura eléctrica en Puerto Rico, e implementar dichas normas de política pública. Estos reglamentos deberán ser cónsonos con la política pública energética declarada por vía de legislación;

(c) Establecer e implementar los reglamentos y las acciones regulatorias necesarias para garantizar la capacidad, confiabilidad, seguridad, eficiencia y razonabilidad en tarifas del sistema eléctrico de Puerto Rico y establecer las guías, estándares, prácticas y procesos a seguir para los procesos para la compra de energía, la modernización de plantas o instalaciones generadoras de energía, disponiéndose que todo contrato de compraventa de energía deberá cumplir con los estándares, términos y condiciones establecidos por el NEPR de conformidad con lo dispuesto en la Ley de Política Pública Energética y esta Ley.

(d) Fiscalizar la calidad, eficiencia y confiabilidad del servicio eléctrico provisto por cualquier compañía de energía certificada en Puerto Rico para garantizar una red robusta que atienda las necesidades de la isla;

[…]

(f) Formular e implementar estrategias para lograr los objetivos de esta Ley, incluyendo, pero sin limitarse a, lograr la meta de reducir y estabilizar los costos energéticos permanentemente, controlar la volatilidad del precio de la electricidad en Puerto Rico, el establecimiento de programas de respuesta a la demanda, los estándares de la Cartera de Energía Renovable y eficiencia energética, promover el almacenamiento de energía e integración de generación distribuida, entre otros. En el ejercicio de sus poderes y facultades, el Negociado de Energía, requerirá que los precios en todo contrato de compraventa de energía, toda tarifa de trasbordo y todo cargo de interconexión eléctrica sean justos y razonables, cónsonos con el interés público y cumplan con los parámetros que establezca el Negociado vía reglamento;

[…]

(n) Aprobar, revisar y, según fuere aplicable, modificar las tarifas o cargos que cobren las compañías de servicio eléctrico o el Contratante de la red de transmisión y distribución en Puerto Rico por cualquier asunto directa o indirectamente relacionado con la prestación del servicio eléctrico;

[…]

(p) Asegurar que los poderes y facultades que ejerza el NEPR sobre la Autoridad, su sucesora, el Contratante de la red de transmisión y distribución, las compañías de energía y cualquier persona natural o jurídica que se haya beneficiado o pueda beneficiarse del sistema eléctrico de Puerto Rico, incluyendo lo relacionado con la aprobación o revisión de las tarifas garanticen el pago de la deuda de la Autoridad con los bonistas;

[…]

(rr) Revisar decisiones finales de las compañías de energía con respecto a querellas y solicitudes

de investigación de sus clientes. Todas las órdenes que expida y emita el NEPR se expedirán a nombre del Negociado de Energía de Puerto Rico y de la Junta Reglamentadora de Servicio Público de Puerto Rico. Todas las acciones, reglamentaciones y determinaciones del NEPR se guiarán por las leyes aplicables, por el interés público y por el interés de proteger los derechos de los clientes o consumidores. Las disposiciones de esta Ley serán interpretadas liberalmente para poder alcanzar sus propósitos y dondequiera que algún poder específico o autoridad sea dada al NEPR, la enumeración no se interpretará como que excluye o impide cualquier otro poder o autoridad de otra manera conferida a esta. El NEPR aquí creado tendrá, además de los poderes enumerados en esta Ley, todos los poderes adicionales implícitos e incidentales que sean apropiados y necesarios para efectuar y llevar a cabo, desempeñar y ejercitar todos los poderes antes mencionados y para alcanzar los propósitos de esta Ley. Íd.

Por otra parte, el Art. 6.4 de la Ley Núm. 57-2014, 22 LPRA sec. 1054c, le confiere jurisdicción primaria exclusiva al NEPR sobre la aprobación de las tarifas y cargos que cobren las compañías de energía en relación con cualquier servicio eléctrico a sus clientes, así como sobre los casos y controversias relacionados. A su vez, es el Art. 6.25 de la citada ley, 22 LPRA sec. 1054x, el que regula ese proceso de aprobación y revisión de las propuestas de tarifas que presenten las compañías de servicio eléctrico. Al hacerlo, le encomienda al NEPR asegurarse de que todas las tarifas sean "justas y razonables y consistentes con prácticas fiscales y operacionales acertadas que proporcionen un servicio confiable, al menor costo razonable". Íd.

A mi juicio, un análisis de estas normas arroja que la labor encomendada por la Asamblea Legislativa al NEPR en este asunto consiste en decidir qué tarifa es justa y

razonable, así como fiscalizar a las compañías de servicio eléctrico. **De ninguna disposición de la Ley Núm. 57-2014,** ***supra***, **surge palmariamente una delegación de poder al NEPR para otorgar relevos de responsabilidad civil extra-contractual como parte de la aprobación de las tarifas y cargos que cobrarán las compañías de energía.**

En segundo orden, como mencioné, la Ley Núm. 120-2018, *supra*, erigió el andamiaje estatutario que permitió la privatización del sistema de transmisión y distribución de energía eléctrica mediante el establecimiento de Alianzas Público-Privadas. Según su Exposición de motivos, para la Asamblea Legislativa fue importante: (1) la utilización del marco legal ofrecido por la Ley de Alianzas Público Privadas, Ley Núm. 29-2009, según enmendada, 27 LPRA sec. 2601 *et seq.*, porque proveía la transparencia y flexibilidad necesaria para una negociación que redundara en un sistema energético financieramente viable con un enfoque en el bienestar del consumidor; (2) la regulación de la industria energética mediante un regulador independiente, en la figura del NEPR, con el fin de llevar a cabo sus funciones de manera firme y contundente; y (3) la sujeción de todo contratante en las transacciones de la AEE a la potestad del NEPR sobre las tarifas y cargos.

En ese esfuerzo, la Sección 3 de la Ley Núm. 120-2018, 22 LPRA sec. 1113, provee varios lineamientos importantes sobre la intención legislativa y la política pública

promulgada en ese estatuto. Entre ellos, destaco que la Asamblea Legislativa: (1) dejó claro que la AEE es una criatura legislativa, dotada por delegación de su existencia, facultades, deberes, actividades y administración de activos y franquicias pertenecientes al Pueblo de Puerto Rico; (2) afirmó que "ninguna ley o reglamento podrán ser utilizados o interpretados en contraposición a las disposiciones de esta Ley, excepto por enmiendas a la misma"; (3) consignó que los contratos que surjan de esa ley estarán revestidos y protegidos por nuestra normativa constitucional respecto al disfrute de la propiedad, el debido proceso de ley y la no aprobación de leyes que menoscaben obligaciones contractuales legítimas; (4) subrayó que su intención es agilizar un proceso justo y transparente para establecer alianzas público-privadas respecto a cualquier función, servicio o instalación de la AEE, de forma que redunde en tarifas razonables y acceso universal; e (5) hizo la salvedad de que si no era posible, por razones de mercado, crear un entorno competitivo en cada una de las actividades relacionadas al servicio eléctrico, más rigurosas tendrán que ser las evaluaciones de las propuestas para garantizar que resulten en el beneficio del Pueblo de Puerto Rico.

Para cumplir con este objetivo, la Sección 5 de la referida ley autoriza a la AEE a ejecutar cualquier transacción y otorgar contratos de alianza relacionados con ella. 22 LPRA sec. 1115. Entre las tareas de esa corporación

pública, esta sección le delega el designar un Comité de Alianzas para, entre otras cosas, negociar los términos y condiciones que considere apropiadas para los contratos de alianza. Sobre estos, el inciso (d) de la Sección 8 de la Ley Núm. 120-2018, 22 LPRA sec. 1118, faculta al NEPR a asistir a la AEE en la supervisión del desempeño y cumplimiento de los contratantes bajo los contratos de alianza, una vez se consume la transacción. En este asunto, subordina al NEPR al contrato, pues deja claro que no tendrá autoridad para alterarlo o enmendarlo. Íd. Con relación a la facultad de cobrar derechos, rentas o tarifas, el inciso (f) de la Sección 8, *supra*, es diáfano en cuanto a que el NEPR retiene su jurisdicción para revisar y aprobarlos.

Lo que un estudio de ambos estatutos revela es que no existe una concesión expresa por la Asamblea Legislativa a la AEE o al NEPR del poder de otorgar un relevo de responsabilidad a las compañías que sean parte de una transacción relacionada con la transmisión y distribución de la energía eléctrica. **De hecho, al respecto, se guarda silencio.**

E.

En nuestro ordenamiento, impera la codificación del Derecho Privado mediante el Código Civil de 2020, 31 LPRA sec. 5311 *et seq*. En términos generales, el Art. 1 del Código Civil de 2020, 31 LPRA sec. 5311, dispone que el código, por ser de origen civilista, será interpretado con atención a

las técnicas y la metodología del Derecho Civil. Entretanto, el Art. 2 coloca como las fuentes del ordenamiento jurídico a la Constitución, la ley, la costumbre y los principios generales del Derecho. 31 LPRA sec. 5312. Por ello, el Código Civil y nuestra normativa civilista son creaciones de la Asamblea Legislativa. Por lo tanto, su aprobación y derogación son prerrogativas legislativas.

En lo pertinente, el Art. 1063 del Código Civil de 2020, 31 LPRA sec. 8984, incluye, entre las fuentes de las obligaciones, los actos u omisiones en los que interviene la culpa o negligencia. Así, el Art. 1536 prescribe que "[l]a persona que por culpa o negligencia causa daño a otra, viene obligada a repararlo". 31 LPRA sec. 10801. A esta obligación, también le llamamos responsabilidad civil extracontractual y es una creación legislativa, pues le compete a la Asamblea Legislativa aprobar lo relativo a ella. Visto así, todas las personas poseen legitimación para reclamar reparación a quien les cause un agravio mediando la culpa o la negligencia.

Cónsono con ello, también hemos reconocido la facultad del agraviado de liberar al responsable de causarle un daño. Esta potestad nace del Art. 14 del Código Civil de 2020, 31 LPRA sec. 5333, al establecerse que "[l]os derechos que concede la ley pueden renunciarse siempre que no se prohíba su renuncia o que esta no sea contraria a la ley, a la moral

ni al orden público, ni en perjuicio de tercero". Véase también *Negrón Vélez v. ACT*, 196 DPR 489, 504 (2016).

Precisamente en virtud de un lenguaje como ese, en el pasado establecimos como requisito indispensable que toda renuncia, expresa o tácita, debe ser clara, terminante, explícita e inequívoca. *Eastern Sands, Inc. v. Roig Comm. Bank*, 140 DPR 703, 719-720 (1996); *Torres Solís et al. v. A.E.E. et als.*, 136 DPR 302 (1994); *Chico v. Editorial Ponce, Inc.*, 101 DPR 759, 778 (1973). A eso, también hemos sumado que, de ordinario, la renuncia de derechos es de estricta interpretación, no se presume y no se permite deducirla de expresiones de dudosa significación. Íd., citando a *Quiñones Quiñones v. Quiñones Irizarry*, 91 DPR 225, 266 (1964).

Visto así, identifico dos (2) fuentes de derecho posibles para que no exista responsabilidad de un tercero por los daños que causa a razón de actos u omisiones culposas o negligentes: (1) la renuncia del derecho a indemnización por parte del agraviado, observable típicamente en relevos de responsabilidad o acuerdos de transacción; y (2) el acto legislativo de eximir de responsabilidad ciertos actos u omisiones. Esto último se puede apreciar en el Art. 1537 del Código Civil de 2020, 31 LPRA sec. 10802, en el que la Asamblea Legislativa codificó la inmunidad familiar e impidió acciones de daños entre padres e hijos, abuelos y nietos, y cónyuges, sujeto a ciertas restricciones.

IV

Delimitado todo esto, lo que queda es delimitar: ¿quién tiene el poder para qué?, tal y como decía el Prof. Raúl Serrano Geyls respecto a controversias constitucionales de similar naturaleza. R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, Puerto Rico, Ramallo Bros. Printing, 1986, Vol. I, pág. 571.

En primer lugar, considero imperativo identificar con claridad la existencia del poder delegado en cuestión. La cuestionada facultad de la que trata este caso es la reclamada por el NEPR para conceder un relevo de responsabilidad extracontractual en nombre de los clientes -consumidores del servicio eléctrico- y a favor de la AEE y LUMA, incluidos sus directores, oficiales, empleados, agentes y contratistas, por cualquier pérdida relacionada con la operación y manejo del sistema de transmisión y distribución de energía. Este relevo de responsabilidad abarca daños provocados por un servicio eléctrico interrumpido, irregular o deficiente, como resultado de fuerza mayor, deterioro preexistente del sistema, actos de sabotaje o <u>negligencia ordinaria</u>. Entre sus disposiciones, el relevo mantiene exclusivamente la responsabilidad por los daños causados mediando negligencia crasa, *willful misconduct* o dolo.

En segundo lugar, del derecho esbozado surge diáfanamente que este poder —el de relevar o eximir de responsabilidad civil extracontractual— pertenece a la

Asamblea Legislativa en lo colectivo y a cada persona en lo individual. De ese modo, vislumbro que, para que colectivamente se exima de responsabilidad extracontractual a los proveedores de la energía eléctrica, se requiere un acto legislativo positivo, claro e inequívoco, en el que expresamente se disponga el relevo o se delegue el poder de ejecutarlo en una autoridad del Poder Ejecutivo, junto a un principio inteligible que le acompañe.

Recordemos, igualmente, que las agencias administrativas no pueden asumir jurisdicción sobre una conducta sin una autorización legal clara, pues únicamente tienen aquellos poderes que su ley habilitadora expresamente les otorgue y que sean indispensables para ejecutar su encomienda primordial. *Col. Médicos et als. v. Com. Seguros et al., supra*, pág. 372. Toda actuación que no responda a un poder conferido mediante legislación es *ultra vires*. Íd. En ese análisis, no podemos sustituir la fuente de poder de una agencia con la necesidad, la utilidad o la conveniencia. *Raimundi v. Productora, supra*, pág. 225. Ante duda sobre la existencia del poder reclamado, debemos resolver en contra de su ejercicio. Íd.

Por eso, al no encontrar —ni el NEPR ni LUMA señalar— una disposición estatutaria en la que la Asamblea Legislativa haya conferido al Negociado la autoridad para ejecutar un relevo a LUMA en nombre de los consumidores del servicio de energía eléctrica, considero imperativo declarar

que el NEPR se excedió al arrogarse ese poder y, por lo tanto, violentó el principio de la separación de poderes. Del silencio de la Asamblea Legislativa no podemos validar una delegación, y mucho menos una tan amplia como la que reclama el Negociado. Tampoco lo puede hacer una agencia del Poder Ejecutivo, ya que ello sobrepasa las salvaguardas que la separación de poderes impone para evitar una acumulación indebida del poder en una sola rama. Al igual, no persuaden los argumentos de necesidad, utilidad o conveniencia de reconocerle al Negociado este poder de relevar. De este modo, es evidente que en este pleito no se supera un escrutinio en el crisol de la doctrina de la delegación de poderes, ni la de cuestiones principales de derecho.

Por un lado, de lo anterior se desprende que no nos hallamos ante unos estatutos que establezcan un principio inteligible para obligar al NEPR en la ejecución de un poder delegado. Véase *Gundy v. United States*, *supra*, y *Sánchez et al. v. Depto. de Vivienda et al.*, *supra*. En ese sentido, la Asamblea Legislativa tampoco delineó una política o norma general que el Negociado tenga que aplicar o que encauce el ejercicio del referido poder. Íd.; *López v. Junta de Planificación*, *supra*.

En contrario, el NEPR plantea que la *Resolution and order* del 31 de mayo de 2021 fue el resultado de un procedimiento tarifario participativo en el que la agencia ejerció su conocimiento técnico especializado y aprobó unos

términos consistentes con el derecho vigente, el interés público y la política pública energética de Puerto Rico. En otras palabras, para el Negociado, la facultad de otorgar un relevo de responsabilidad está incluido en su poder de negociar la tarifa. No le asiste la razón.

Los Arts. 6.3, 6.4 y 6.25 de la Ley Núm. 57-2014, *supra*, ciertamente le confieren al NEPR facultades para aprobar y revisar las tarifas y cargos que cobren las compañías de energía a su clientela. Sin embargo, estos poderes son primordialmente de fiscalización. En cambio, la Ley Núm. 120-2018, *supra*, no colocó al Negociado en el centro de la negociación del contrato de alianza con la compañía seleccionada para operar el sistema de transmisión y distribución de energía. De hecho, el *O&M Agreement* solo fue firmado por la AEE, la AAPP y LUMA. Lo que sí hizo la Ley Núm. 120-2018, *supra*, fue preservar las facultades de fiscalización del NEPR. Sin una delegación legislativa expresa al respecto, al NEPR únicamente le corresponde fiscalizar, regular y negociar la tarifa, **no decretar por fíat administrativo** una inmunidad civil extracontractual. Es decir, el poder delegado es para gestionar y fiscalizar la tarifa, y no para relevar de responsabilidad. Me reafirmo en que esa tarea, o su delegación, corresponde a la institución que tiene el poder para ejercerla: la Asamblea Legislativa.

A ello se suma que, en el esquema adoptado por la Ley Núm. 57-2014, *supra*, y la Ley Núm. 120-2018, *supra*, la

Asamblea Legislativa no modificó nuestro ordenamiento de responsabilidad civil de manera que las facultades provistas al Poder Ejecutivo incluyeran el poder delegado de relevar de responsabilidad. Ante esa realidad, no es posible concluir que, dada nuestra tradición civilista, el NEPR, la AEE o la AAPP ostentan la potestad de relevar de responsabilidad a las compañías de servicio eléctrico.

**Tampoco podemos separar el concepto de responsabilidad civil de la intención legislativa y del interés social que la inspiran. Por medio de ella se busca que las personas agraviadas obtengan reparación por los daños que sufren a costa de la culpa o la negligencia de otras personas o entidades. Ese ánimo reparador hace todavía más importante resguardar nuestro ordenamiento civil de exoneraciones no autorizadas en ley.**

Por último, entiendo pertinente recalcar que tampoco corresponde hablar del menoscabo de una obligación contractual. El *O&M Agreement* entre la AEE, la AAPP y LUMA incluyó que las partes someterían al NEPR los términos específicos de un relevo de responsabilidad y lo cumplieron. El contrato no requería la aprobación del relevo, únicamente que se sometiera a la consideración del NEPR. Eso se hizo según se pactó. Además, a mi juicio, considero que tampoco es correcto que la declaración de nulidad del relevo constituye un incumplimiento o modificación material del *O&M Agreement* bajo su Artículo 14 porque una interpretación tan

abarcadora de esa disposición atentaría contra la ley y el orden público.

V.

Hoy LUMA reclama una inmunidad que la haría operar impune frente a los reclamos de miles de consumidores. **Nuestro ordenamiento no ampara tal evasión de responsabilidad.** Por los fundamentos expuestos, estoy conforme con el dictamen de este Tribunal.


Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Departamento de Asuntos del
Consumidor

    Peticionario

        v.

LUMA Energy, LLC; LUMA Energy
ServCo., LLC; Negociado de
Energía de Puerto Rico;
Autoridad de Energía Eléctrica

    Recurridos

CT-2025-0003

Opinión Concurrente emitida por el Juez Asociado señor COLÓN PÉREZ a la que se une la Jueza Presidenta ORONOZ RODRÍGUEZ.

En San Juan, Puerto Rico, a 1 de diciembre de 2025.

En medio de la crisis energética por la que atraviesa el País, caracterizada por las continuas y constantes interrupciones en el servicio eléctrico, -- ocasionadas, en gran parte, debido al desconocimiento que ha demostrado tener la empresa privada que maneja el mismo --, alguien debe y tiene que responderle a las consumidoras y los consumidores puertorriqueños cuando, en escenarios como los antes descritos, sufren cuantiosas e innumerables pérdidas. Habiendo examinado cuidadosa y detenidamente los deberes y las responsabilidades que las empresas LUMA Energy, LLC y LUMA Energy ServCo., LLC (en adelante y en conjunto, "LUMA

Energy") contrajeron con el Pueblo de Puerto Rico, en el momento en que contractualmente se obligaron a proveer los servicios de transmisión, distribución y mantenimiento de nuestra red eléctrica, notamos que es la referida empresa privada la llamada a responder por las pérdidas antes descritas.[1] Cualquier interpretación en contrario que sobre

---

[1] Según la Sección 18.2(a) del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement*, -- otorgado entre LUMA Energy, la Autoridad de Alianzas Público-Privadas de Puerto Rico y la Autoridad de Energía Eléctrica de Puerto Rico (en adelante, "AEE") --, la AEE, generalmente, será responsable de indemnizar a LUMA Energy por toda suma que esta última se vea obligada a pagar para satisfacer una sentencia final y firme dictada a favor de un abonado o cliente de la AEE o LUMA Energy. **No obstante, la Sección 18.2(b) del referido acuerdo indica que, como excepción a lo anterior, cuando las pérdidas sufridas por LUMA Energy sean consecuencia de su propia negligencia ordinaria o crasa, o de su conducta culposa o intencional, la AEE no vendrá llamada a reembolsar o realizar pago alguno a LUMA Energy.**

En específico, las referidas disposiciones contractuales establecen lo siguiente:

**Section 18.2 Indemnification by Owner.**

(a)    <u>Generally</u>. Subject to the limitations on liability set forth in this Section 18.2 (*Indemnification by Owner*), Section 18.3 (*Limitation on Liability*), Section 18.4 (*Insurance and Other Recovery*), Section 18.5 (*Liability Limitation for Certain Damages*) and Section 18.6 (*Additional Liability Limitation for Certain Damages*), Owner shall indemnify, defend and hold harmless Operator and the Equity Participants and its and their respective Affiliates and Representatives (each, including Operator, an "<u>Operator Indemnitee</u>"), from and against (and pay the full amount of) any and all Losses incurred by an Operator Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction: [. . .] (vi) claims brought against Operator by a T&D Customer in connection with the T&D System or Operator's performance of the O&M Services; [. . .].

(b)    <u>Limitations</u>. [. . .] Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any Losses to the extent caused by or due to: (i) [. . .]; (ii) the negligence (including gross negligence) or willful misconduct of any Operator Indemnitee; [. . .]. Sección 18.2 del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (22 de junio de 2020), docs.pr.gov/files/P3-PublicaPrivadas/Projects/Projects/TD - LUMA/OM Agreement/executed-consolidated-om-agreement-td.pdf.

De otra parte, la Sección 7.6(a)(i) del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* establece que ciertos gastos serán únicamente responsabilidad de LUMA Energy y que no

esto último se haya realizado, particularmente aquella que realizó el Negociado de Energía de Puerto Rico (en adelante, "Negociado de Energía"), no tiene cabida en nuestro ordenamiento jurídico. Por ello, concurrimos con el resultado al que llega una mayoría de este Tribunal en el presente caso. Nos explicamos.

Los hechos que dan vida al presente litigio se recogen con particular precisión en la *Opinión* que hoy emite este Tribunal, razón por la cual hemos decidido adoptar los mismos por referencia. En esencia, y en lo que respecta a la causa de epígrafe, veníamos llamadas y llamados a resolver si cierta *Resolución y Orden* emitida por el Negociado de Energía excedía las facultades delegadas por la Asamblea Legislativa a la referida agencia administrativa y, en consecuencia, la misma era nula. Mediante dicho dictamen, y a grandes rasgos, el Negociado de Energía relevó a LUMA Energy y a la Autoridad de

---

serán transferibles a la AEE ni a sus abonados. Dicha sección dispone como sigue:

**Section 7.6 Disallowed Costs.**

(a) <u>Generally</u>. Subject to the limitations on liability in Section 18.3 (*Limitation on Liability*), none of the following shall be treated as T&D Pass-Through Expenditures for purposes of payment from Owner to Operator, and each shall be the sole responsibility of Operator (collectively, "<u>Disallowed Costs</u>"):

(i) any and all T&D Pass-Through Expenditures, Capital Costs, Outage Event Costs or Excess Expenditures incurred as a result of Operator's negligence (including gross negligence) or willful misconduct, except in connection with Section 5.10 (*Environmental, Health and Safety Matters*) where the applicable standard shall be gross negligence or willful misconduct to the extent provided therein;

[. . .]. Sección 7.6(a) del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (22 de junio de 2020), docs.pr.gov/files/P3-PublicaPrivadas/Projects/Projects/TD - LUMA/OM Agreement/executed-consolidated-om-agreement-td.pdf.

Energía Eléctrica (en adelante, "AEE") de responsabilidad, tanto contractual como extracontractual, en aquellos casos en que, como consecuencia de su negligencia en el manejo de nuestra red eléctrica, se causasen daños a las consumidoras y los consumidores puertorriqueños.

Al acercarse a dicha controversia, una mayoría de mis compañeras y compañeros de estrado correctamente resuelven que, en efecto, la referida *Resolución y Orden* es nula, toda vez que el mencionado organismo administrativo no tiene la autoridad ni la facultad en ley para eximir o limitar la responsabilidad civil por la que una parte viene llamada a responder en escenarios donde ésta cause daños a otros como consecuencia de su negligencia. **<u>Y es que no podía ser de otra forma</u>**.

Como sabiamente lo ha ilustrado a lo largo de todo este litigio el Instituto de Competitividad y Sostenibilidad Económica, -- hábilmente representado por los licenciados Fernando E. Agrait y José L. Pou --, en Puerto Rico, la autoridad para eximir de responsabilidad civil, en escenarios como los aquí bajo estudio, corresponde exclusivamente a la Asamblea Legislativa, y no a organismos administrativos. Máxime, si tomamos en consideración que, el asunto de la delimitación de la responsabilidad civil, en el contexto de los temas que hoy nos ocupan, debe ser tomado como uno no tarifario. Con dicha apreciación, y con los muy bien elaborados fundamentos que desarrolló el Instituto de Competitividad y Sostenibilidad Económica en apoyo a ésta, coincidimos.

Recordemos que, en virtud de la doctrina de separación de poderes,[2] es la Asamblea Legislativa quien tiene la prerrogativa de crear, -- mediante la aprobación de una ley --, una agencia administrativa y delegarle a ésta ciertos poderes para que actúe conforme a los propósitos para los cuales fue creada. *DACo v. AFSCME*, 185 DPR 1, 12 (2012); *López Nieves v. Méndez Torres*, 178 DPR 803, 810 (2010); *Caribe Comms., Inc. v. PRTCo.*, 157 DPR 203, 211 (2002). **"Esa delimitación de poderes precisa la acción administrativa y las circunstancias en las que puede actuar la agencia"**. *López Nieves v. Méndez Torres*, *supra*. Véase, D. Fernández Quiñones, *Derecho administrativo y Ley de Procedimiento Administrativo Uniforme*, 2.ª ed., Bogotá, Ed. Forum, 2001, pág. 517. Así, cuando una agencia administrativa actúa por encima de los poderes que le fueron delegados, esa actuación se considera nula. *R&B Power, Inc. v. Junta de Subastas de la*

---

[2] A grandes rasgos, la doctrina de separación de poderes es aquella que postula que nuestro sistema republicano de gobierno está compuesto de tres grandes poderes de gobierno, a saber: el Poder Legislativo, el Poder Ejecutivo y el Poder Judicial. *Córdova y Otros v. Cámara Representantes*, 171 DPR 789, 799 (2007); *Acevedo Vilá v. Meléndez*, 164 DPR 875, 882 (2005); *Misión Ind. P.R. v. J.P.*, 146 DPR 45, 89 (1998). Bajo este esquema, cada poder cosntitucional de gobierno tiene sus responsabilidades muy bien definidas. El Poder Legislativo es el llamado a establecer la política pública, el Poder Ejecutivo el encargado de implementarla y el Poder Judicial resuelve cualesquiera controversias que puedan surgir a raíz de lo anterior. A. Acevedo Vilá, *Separación de poderes: Entre la teoría y práctica*, 2.ª ed., San Juan, Ediciones SITUM, 2023, pág. 31; Véase, *Banco Popular de Puerto Rico v. Corte de Distrito de San Juan*, 63 DPR 66, 71 (1944).

Como se sabe, el propósito de la precitada doctrina es evitar que una de las tres ramas de gobierno amplíe su autoridad e interfiera con el poder de otra. *Córdova y Otros v. Cámara Representantes*, *supra*; *Acevedo Vilá v. Meléndez*, *supra*; *Misión Ind. P.R. v. J.P.*, *supra*. La doctrina de separación de poderes no busca promover la eficiencia en el gobierno; busca impedir que se ejercite un poder arbitrario. Acevedo Vilá, *op.cit.*, pág. 32. Véase también, C.M. Llull Vera, *Separación de poderes en Puerto Rico: ¿Existe entre las Ramas Ejecutivas y Legislativa?*, 41 (Núm. 2) Rev. D. P. 275 (2002) y *Myers v. United States*, 272 US 52, 293 (1926)(Brandeis, opinión disidente).

*Administración de Servicios Generales*, 213 DPR 685, 701 (2024);

*FCPR v. ELA et al.*, 211 DPR 521, 536 (2023); *Amieiro González*

*v. Pinnacle Real Estate*, 173 DPR 363, 371 (2008).

En lo referente al Negociado de Energía, y según se desprende de su ley habilitadora, a la referida agencia administrativa se le delegaron, entre otros, los siguientes poderes: (1) establecer e implementar los reglamentos, así como las acciones regulatorias necesarias para garantizar la capacidad, confiabilidad, seguridad, eficiencia y razonabilidad en tarifas del sistema eléctrico; (2) fiscalizar todo lo relacionado con la calidad, eficiencia y confiabilidad del servicio eléctrico provisto por las compañías de energía en el País; (3) garantizar el acceso universal al servicio eléctrico; (4) implementar estrategias para cumplir con los objetivos de la ley en cuestión, incluyendo la reducción y estabilización de los costos energéticos permanentemente y controlar la volatilidad del precio de electricidad, entre otros; (5) emitir órdenes y otorgar los remedios legales necesarios para hacer efectivos los propósitos del precitado estatuto y hacer que se cumplan sus reglas, reglamentos, órdenes y determinaciones; y (6) revisar decisiones finales emitidas en querellas y solicitudes de investigación presentadas por las consumidoras y los consumidores puertorriqueños ante las compañías de energía. Ley Núm. 57 de 27 de mayo de 2014, mejor conocida como la *Ley de Transformación y ALIVIO Energético*, 22 LPRA sec. 1051 *et seq.*, incisos (c)-(f), (pp), (rr). **Como se puede apreciar, entre las**

**facultades delegadas al Negociado de Energía, no estuvo, -- como correctamente sostiene una mayoría de este Tribunal --, el poder de conceder inmunidad a una entidad privada en reclamaciones por responsabilidad civil, como consecuencia de su negligencia**.

En ese sentido, cualquier cláusula contractual contenida en el *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* que viabilice o pudiese viabilizar tal proceder, -- como lo sería la Sección 4.1(g) del mismo --, tendría una presunción de nulidad por considerarse *ultra vires*.[3] Lo anterior así, ya que, según mencionamos, un organismo administrativo, -- en este caso, el Negociado de Energía --, no tiene la autoridad ni la facultad

---

[3] En específico, la Sec. 4.1(g) del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* dispone lo siguiente:

> (g) <u>Liability Waiver</u>. In connection with the submission of the Initial Budgets to PREB, the Parties agree to apply for inclusion in the Rate Order that the associated tariff or terms of service include: (i) a waiver of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the T&D System and the provision of Power and Electricity including any events of interrupted, irregular or defective electric service due to Force Majeure Events, other causes beyond Owner's, ManagementCo's or ServCo's control or ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors; and (ii) a waiver in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of Owner's, ManagementCo's or ServCo's ordinary negligence, gross negligence or willful misconduct (collectively the "Liability Waiver"). Sección 4.1(g) del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (22 de junio de 2020), docs.pr.gov/files/P3-PublicaPrivadas/Projects/Projects/TD - LUMA/OM Agreement/executed-consolidated-om-agreement-td.pdf.

para eximir o limitar la responsabilidad civil por la que una parte viene llamada a responder en escenarios donde ésta cause daños a otros como consecuencia de su negligencia. Ello, como ha sido previamente sentenciado por este Tribunal en innumerables ocasiones, recae bajo los poderes de la Asamblea Legislativa.[4]

Por último, es norma reiterada que, en los sistemas civilistas como el nuestro, los contratos constituyen ley entre las partes. *Carmen Carrasquillo Pérez v. Asociación Consejo de Titulares del Condominio Parque 352*, 214 DPR 1033, 1050 (2024); *Efraín Echandi v. Stewart Title Guaranty Co.*, 174 DPR 355, 369 (2008); *Wanda Monteagudo Pérez v. Estado Libre Asociado de Puerto Rico*, 172 DPR 12, 20 (2007). Así pues, como regla general, se hará valer la voluntad de los contratantes, según expresado en el acuerdo habido entre éstos. *Carmen Carrasquillo Pérez v. Asociación Consejo de Titulares del Condominio Parque 352*, supra; *Jiménez López v. SIMED*, 180 DPR 1, 10 (2010); *López v. Atlantic Southern Ins. Co.*, 158 DPR 562, 569 (2003). **Ahora bien, lo anterior será así siempre y cuando el contrato, -- o alguna de sus cláusulas --, no sea contrario a la ley, la moral**

---

[4] Recordemos que, el Art. 1536 del Código Civil de 2020 establece que, en nuestro ordenamiento jurídico, "la persona que por culpa o negligencia cause daño a otra, viene obligada a repararlo". 31 LPRA sec. 10801. **Ahora bien, nuestra Asamblea Legislativa, -- dentro de sus prerrogativas constitucionales --, tiene la facultad de eximir o limitar la responsabilidad civil por la cual una persona, ya sea natural o jurídica, venga llamada a responder ante otra en caso de causarle daño**. Véase, *Rodríguez Figueroa y otros v. Centro de Salud Mario Canales Torresola y otros*, 197 DPR 876 (2017). **Dicha exención o limitación ocurrirá, claro está, mediante legislación aprobada a esos fines**. *Íd*. **Así pues, ante la ausencia de una disposición expresa concediendo inmunidad, se presume que quien cause un daño responderá extracontractualmente por sus actos culposos o negligentes**. *Consejo Cond. Plaza del Mar v. Jetter*, 169 DPR 643, 657 (2006); *Romero Arroyo v. E.L.A.*, 127 DPR 724, 741 (1991); *Feliciano Rosado v. Matos, Jr.*, 110 DPR 550, 565 (1981).

**o el orden público**. Art. 342, Código Civil de Puerto Rico de 2020, 31 LPRA sec. 6312. Véase también *Vélez v. Izquierdo*, 162 DPR 88, 98 (2004); *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 724-725 (2001). En dichos escenarios, el contrato en su totalidad o la cláusula de la que se trate se considerara nula. *Íd*. No albergamos duda alguna que la Sección 4.1(g) del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* es una de éstas últimas, lo que, a nuestro juicio, también abona a la conclusión a la que hoy llegan una mayoría de mis compañeras y compañeros de estrado, con la cual el juez que suscribe concurre.

En fin, como ha quedado claramente demostrado a lo largo de este escrito, en nuestro ordenamiento jurídico, es el Poder Legislativo el que tiene la prerrogativa de eximir, a modo de excepción, a una parte de responsabilidad civil, -- o establecer los límites hasta los que responderá --, ante la eventualidad de que, por su culpa o negligencia, le cause daño a otra. Esto es así, pues, para otorgar tal privilegio, es indispensable la aprobación de una ley a esos efectos; un poder que, como indicamos, recae, única y precisamente, sobre este último.

No podía, pues, el Negociado de Energía, ejerciendo poderes que sólo le competen a la Asamblea Legislativa, **-- y que, dicho sea de paso, tampoco le fueron delegados al referido ente mediante su ley habilitadora --**, eximir a LUMA Energy de responsabilidad cuando, por sus propios actos negligentes, cause daños a las consumidoras y los consumidores

puertorriqueños. Al así hacerlo, el Negociado de Energía, sin lugar a dudas, se extralimitó de las facultades que le fueron concedidas por el legislador y la legisladora para lograr su encomienda, actuando de una manera que no tiene cabida en nuestro sistema jurídico.

Por tanto, procedía, tal y como lo hizo una mayoría de este Tribunal, declarar la nulidad de la *Resolución y Orden* emitida por el Negociado de Energía el 31 de mayo de 2021. **LUMA Energy, como cualquier otra persona, natural o jurídica, -- en ausencia de legislación que disponga lo contrario --, tiene la obligación de responder ante las consumidoras y los consumidores puertorriqueños para reparar aquellos daños que, por sus actos negligentes, le haya causado a éstos**. El error señalado fue cometido.

Es, pues, por todo lo antes expuesto que concurrimos con el resultado al que hoy llega una mayoría de este Tribunal.


Ángel Colón Pérez
Juez Asociado